WILLIAM E. HUSBANDS, Tax Collector, p. b. a., *vs.* ABNER P. TALLEY, d. b. r.

*School Laws—Legislative ,Intent—Statute ; Construction of—Repeal by Implication—Taxation—Building School House.*

1. Authoritative adjudications clearly show that, in determining questions o repeal by implication, the legislative intention is the controling factor, and its ascertainment the paramount object.

2. The enactment of a general system of government complete in itself, or the revision of a previous statute or statutes, covering the entire subject of such prior enactments, and the consolidation thereof, especially with new provisions, in a single act complete in itself, is regarded as evidence of the legislative intent and purpose to substitute the latter for the former, and consequently is a repeal thereof.

3. The power to build a school house and to raise by taxation the funds necessary therefor are amply provided for by sections 14, 15, 17, 18, 19 and 20 of the act entitled "An Act Concerning the Establishment of a General System of Free Public Schools," passed at Dover, May 12, 1898.

4. The said act of 1898 was designed to provide a complete general system for the government and administration of the frce public schools of the State, and was intended to be a complete revision of the prior general free public school laws, and a consolidation and codification of them with such new provisions as were deemed advantageous, in a single act desiged to cover the whole subject in all respects, and to be a substitute for all antecedent general free school legislation not incorporated therein, or continued in force thereby as essential to its effective operation.

5. *Section 3, Chapter 70, Vol. 12, Laws of Delaware (Rev. Code, 328, Sec. 3)*, limiting the amount which may be raised by tax for the purpose of building or repairing a school house to the sum of $500, has been repealed.

*(January 24, 1901.)*

LORE, C. J., and GRUBB, PENNEWILL and BOYCE, Associate Justices, sitting.

*William S. Hilles* for plaintiff.

*L. Irving Handy* for defendant.

Court in Banc.

Question of law arising on a special verdict in an action of debt (No. 125, May Term, 1900), directed by the Superior Court for New Castle County to be heard by the Court in Banc.

GRUBB, J., delivering the opinion of the Court:

The question before this Court arose in a suit in the Superior Court for the recovery of school tax assessed and levied upon the defendant for the building of a new school house in District No. 6 in Brandywine Hundred, New Castle County.

Under Section 14 and other pertinent provisions of the act of May 12, 1898, *Chap. 67 Vol. 21 Delaware Laws*, the school voters of said district, at their stated meeting, in June 1899, resolved, by a majority vote, that the sum of one thousand dollars should be raised by taxation for the purpose of building a new school house therein. Accordingly a tax was duly assessed and levied to raise this sum, upon the defendant and the other taxables within said district, together with the amount required by law, and an additional amount for the maintenance of the school; and the warrant for the collection thereof, was delivered to William E. Husbands the plaintiff the collector of county taxes in said hundred. The defendant having refused to pay his tax, this suit was brought for its recovery by said collector.

At the trial, by agreement of counsel, the jury, under the direction of said Court, rendered a verdict in favor of the plaintiff for the sum of $18.92, subject to the judgment of the Court in Banc whether the provision of *Sec. 3, Chap. 70 Vol. 12 Laws of Delaware (Rev. Code 328, Sec. 3)*, limiting the amount which may be raised by tax for the purpose of building or repairing a school house, to the sum of $500, has been repealed.

The jury having rendered such verdict, the Court thereupon directed said question to be heard here in Banc.

At the argument here, the defendant contended that said provision of section 3 operated as a complete defense to the action. On the other hand the plaintiff claimed that said provision had

been repealed, *first,* by *Sec. 12 Chap. 602 Vol. 19 Laws of Delaware,* passed April 27, 1893, and, *second,* by the said act of 1898, *Chap. 67, Vol. 21.*

The proper determination of the sole question directed to be heard here, will be found in the careful examination of the provisions of the act ef 1898 in connection with the antecedent legislation relating to the gradual evolution and development of free public school education in this State.

In Delaware, from our earliest colonial period, popular education has been the subject of earnest thought and effort in varying degrees at various times, with both her rulers and people. When establishing their early settlements within our borders, Sweden and Holland, then foremost among all the nations of Europe in the promotion of public education, especially directed their colonies to provide for the maintenance of schools and schoolmasters and the instruction of the young. And when the English succeeded them, William Penn's Frame of Government, promulgated in 1682, ordained " That the Governor and Provincial Council shall erect and order all public schools and encourage and reward the authors of useful sciences and laudable inventions in the Province." Accordingly his General Assembly enacted laws contemplating the erection and establishment of public schools in both his Province and the " Territories thereof," as our three counties were then called.

But whilst such was the enlightened design of our early rulers, yet, from our earliest settlement in 1638 until the enactment of our Free School System in 1829, the cause of education was chiefly conducted and maintained in Delaware by religious societies and private schools, or academies. Frequently the clergyman was the schoolmaster and the church, or a private house, the school where popular instruction was imparted. At the best, public school houses were few, good teachers were rare, books scarce, the methods and facilities crude, meagre and altogether inadequate for more than the acquisition of the most rudimentary knowledge.

So far as our statutes show, governmental aid to education was first rendered in 1743, by "An Act for enabling Religious Societies of Protestants within this Government, to Purchase Lands for Burying Grounds, Churches, Houses for Worship, Schools, etc. *Delaware Laws Chap. 108–a, Vol. 1, p. 271.*

The next educational encouragement was given in 1772, when a lot of land in New Castle was granted for a school house site. *Chap. 212–a, Vol. 1, p. 516.* Next follows the direction of our second State Constitution of 1792, that "The Legislature shall, as soon as conveniently may be, provide by law for the establishment of schools and promoting arts and sciences." *Sec. 12 Art. 8, Vol. 1, p. 47.*

With this injunction—so similar to that of Penn's Frame of Government a century earlier—the General Assembly complied February 9, 1796, by passing an act entitled "An Act to Create a Fund sufficient to Establish Schools in this State." *Chap. 15–c, Vol. 2, p. 1296.*

This School Fund was the first appropriation, in the history of the State, of its public revenues for the encouragement and support of popular education, so far at least as its legislative enactments disclose. It marked a new era in the progress of education in Delaware, and proved to be the permanent foundation of her present efficient Free School System. Though small in its beginnings, it steadily grew until, with the addition, in 1837, of Delaware's share of the United States Surplus Revenue, it became a most useful aid and incentive to educational efforts throughout the State.

In 1817 and in 1821, the Legislature appropriated a portion of the annual income of this fund, to be expended yearly for the instruction of the children of the poor in the rudiments of knowledge. But this project proving unsuccessful, said acts were repealed by the act passed February 12, 1829, *Vol. 7, p. 184,* entitled "An Act for the Establishment of Free Schools." This act created the

first general Free School System which had theretofore existed in Delaware.

Under this statute each county throughout the State was divided into incorporated school districts; the qualifications of the school voters were prescribed and the school voters in each school district were required to hold a stated meeting every year. At every stated meeting the school voters present were to elect by ballot, by a majority of votes, a clerk and two commissioners, who should be the school committee of the district; and were further to resolve, by a majority of votes, what sum shall be raised by subscription or by voluntary contribution in the district, for building, procuring or maintaining a school house, or for the support of a free school in the district. The powers and duties of the school committee were, *inter alia*, to determine the site, lease or purchase the necessary ground, and build or procure a suitable school house for the district, but not to remove a school house or build or procure another without the authority of the school voters first given at a stated meeting; to employ and dismiss teachers, to provide a school so long as the funds permit, free to all white children; to receive and collect all money appropriated for the district, or to be raised in it according to the resolution of a meeting of the school voters, and to appoint a collector of the district, etc. The clear income of the school fund thereafter to accrue was to be apportioned and appropriated among the school districts for their aid and encouragement in the maintenance and improvement of their respective schools. Each district, however, should only have from the school fund an amount equal to that resolved to be raised by the voters, and received by the school committee. The act also provided, *inter alia*, for a school superintendent in each county, and prescribed his duties.

This act committed to the school voters the general power over the subject of free schools for their respective districts. Every school district was an incorporated community for the special purpose of taking care of the interests of popular education within its boundaries. It committed to the school voters the power and

responsibility of determining, according to their judgment of their local needs, resources and situation, whether the children of the district shall have the benefit of a free school, and what kind of a school they shall have. It was based on the policy of devolving upon the people the direct charge of their schools, giving them needful facilities in the way of legal provisions, and affording them encouragement and help by the school fund dividends.

Such was the system and policy of the school law of 1829. But, as it provided that the money required for the building and maintaining a school house and for the support of a free school in the respective districts, should be raised only by subscription or by voluntary contribution, it was soon found that, owing partly to the still undeveloped growth of educational sentiment among the people, and partly to the inability or unwillingness of many of them to furnish the requisite funds, larger powers should be given to the school districts. Consequently a supplement to the law of 1829 was enacted January 25, 1830, *Chapter 21, Vol. 8, p. 21*, to supply the defects therein.

Under this supplement, provision was made for the assessment and collection of taxes to raise money for all school purposes, including both school houses and school expenses, not exceeding $300 in any year, with the consent of a majority of the school voters of the district, to be ascertained by ballot at their special meeting. In this rapid and marked transition, within the space of one year, from the old era of no public schools to the new Free School System founded upon voluntary contributions and subscriptions, and thence to the exercise of the taxing power, it was doubtless deemed prudent to impose said prescribed limitation thereon, in order to allay prejudice and avert antagonisms against the newly introduced system.

Time sped on, population increased, interest in public education grew among the more intelligent and appreciative citizens, and demands for better teachers, more comfortable and commodious school houses and improved methods, created needs for larger school revenues, and, consequently, for increased taxation. Natu-

rally these improvements would be opposed by those who felt no interest in education, or were averse to paying taxes, and so these needful taxes were often defeated by their votes at the annual meetings, thus depriving those desiring to educate their children both of the aid of the State school fund and of the assessable property within the district.

That, meanwhile, public sentiment throughout the State was increasing in favor of more ample taxation for the building and improvement of the school houses and the schools, and in favor, especially, of not leaving the power of taxation therefor entirely subject to the illiberal, capricious or prejudiced voter, is apparent from a proper consideration of the several provisions of the act in controversy, *Chapter 70, Vol. 12, p. 108*, entitled "An Act for the Benefit of Free Schools of the State of Delaware" passed March 1, 1861.

At the argument, counsel seemed to consider that these provisions of this statute were designed as a limitation of the powers of the school voters to raise money by taxation. But instead of such a restriction they are, in their general effect, an extensive enlargement of their preceding powers in that behalf, showing a continued legislative tendency, since the passage of the act of 1829, to enlarge the powers of the school districts so as to keep pace with the gradual growth and progress of education in the State, and its consequent needs and requirements.

Section 1 of this act of 1861 imperatively required the school committee to assess and levy every year, for the support of the school of their district—in New Castle County the sum of $75; in Kent County $50, and in Sussex County $30. Section 2 authorized the school voters to raise by taxation, by a majority vote at their annual meeting, for the support of a free school in their district, a sum in addition to that required by section 1 not exceeding $400. Section 3 provided as follows: "That when a majority of the voters of any school district, at their annual meeting in April, wish to raise by tax any sum of money not exceeding $500, for the purpose of building or repairing a school house in

their district, they shall resolve by a majority of votes what sum shall be raised in said district for that purpose, which sum so resolved upon shall be assessed, levied and collected by the commissioners of each district, as provided for by section 1, and applied to the purposes for which it was collected."

Prior to this act of 1861, it was within the power and discretion of a majority of the school voters of the district to refuse to raise any money for school purposes by taxation. Then taxation was entirely voluntary, but, under section 1 of said act, it was made compulsory to the extent prescribed therein, and thus a fixed sum, in addition to the school fund allowance, was annually assured. In this respect the previous general policy of leaving taxation and other general matters pertaining to the schools to the discretion and determination of the school voters was partially modified.

But although section 1 thus divested them of their previous discretionary power not to tax, it in nowise restricted their power to tax for school purposes. Taken in connection with sections 2 and 3 of said act of 1861, it really operated as an enlargement instead of a limitation of the pre-existing power of the school voters to raise needed revenue, as already stated. For, prior to its passage, the power to raise school revenues by taxation was limited to $300 in any one year. Thereafter the compulsory sum prescr bed by section 1, the sum of $400 authorized by section 2 and the sum $500 authorized by section 3, amounting to from $930 to $975, according to the county, might be raised by taxation in any year in any district.

That the compulsory tax sum of $75, etc., and the 'voluntary tax sum of $500 for general school support, and the voluntary tax sum of $500 for building or repairing a school house, as limited in said act, might have been deemed a prudent and sufficient provision, in the legislative judgment, for the needs and requirements of the Free School System throughout the State, in its then stage of development, it is not unreasonable to presume.

But during the intervening period between the act of 1861, and the act of 1898, now in question here, a great advance has taken place in the educational interest and sentiment of the people in various sections of the State; the school system had been changed, enlarged and improved in many ways by legislative action ; the school houses, school teachers, school pupils and school text books, in consequence, had been remarkably increased and improved, and therefore a greater necessity had gradually arisen for more ample powers of taxation in the school voters, to keep pace with the changed conditions and the progressive tendencies of the times.

It is natural that the representatives of the people in their legislative capacity, should recognize and respond to these conditions and tendencies, and it is reasonable that courts should keep this in view in interpreting the legislative intention as disclosed by their enactments.

Two legislative enactments have been especially referred to as indicative of the marked changes and tendencies in the growth and development of our free school system. One of these is *Chapter 50 Vol. 15, p. 84,* passed March 25, 1875. This act made very important changes in the school system. For the first time, during its existence, it introduced a State Board of Education, a salaried State Superintendent of Free Schools, teachers' institutes in each county, uniform text books for the schools and the giving of certificates to teachers after examination by the State Superintendent. This act also enlarged the amount to be annually raised by compulsory taxation in each district to the sum of $100 in New Castle and Kent counties, and $60 in Sussex County; thus again showing the legislative tendency towards more ample school taxation.

The other statute referred to by counsel for plaintiff as showing the like legislative tendency, is *Chapter 602 Vol. 19, p. 688,* passed April 27, 1893 ; and especially section 12 of said act which is as follows: " Section 12. By the vote of the citizens of any district entitled to vote therein, a sum in addition to that required to be raised by law, may be raised by taxation for special improvements, additional teachers, or additional salaries therefor, but, in no

case, shall a single, unincorporated district use any of the fund received from the State, for building or repairing school buildings or premises."

The principal purpose of the act of 1893 was the proper apportionment of the School Fund among the respective school districts, and its application exclusively to the objects therein specified, but in no case to the building or repairing school buildings or premises. As the school fund apportionments had theretofore been applicable to the building or repairing school buildings, as well as to other school purposes, it is urged that, owing to the concluding clause of section 12 having made it no longer applicable thereto, it was the design of the preceding clause of said section 12 to give the power to raise by voluntary taxation, without any restriction, any sum deemed necessary by a majority of the school voters for building or repairing a school house, and therefore that the five hundred dollars limitation of *Section 3 Chapter 70 Vol. 12, Act of 1871*, is designedly superseded by this provision of the act of 1893.

It is contended for the plaintiff that, in the legislative contemplation, "special improvements" in section 12, mean the "building or repairing a school house" as employed in section 3 act of 1861, and, consequently, that the act of 1893 in granting an unlimited power, has repealed the said section of the prior act granting a limited power of taxation. Whilst we do not deem it necessary in the determination of the question directed to be heard here, to pass upon either of these questions raised by said section 12, yet, in the light of the growth and progress of the free school system, and of the gradual legislative tendency to enlarge the taxing power correspondingly, the contention for the plaintiff that in section 12 of the act of 1893, it was the legislative design to grant said power of taxation unfettered by the limitations of the act of 1861, seems to have much support.

We now come to the contention that the act of 1898 has by implication repealed section 3 of the act of 1861. All that may be said in behalf of the similar claim respecting the act of 1893, and far more, may be urged in support of this contention.

The principles of law governing statutory repeal by implication are well recognized and authoritatively established. An exposition of them peculiarly applicable in the case before this Court, is found in *District of Columbia vs. Hutton, 143 U. S., 18–28,* where the Court (per Lamar, J.) say: "We are not unmindful of the rule that repeals by implication are not favored. But there is another rule of construction equally sound and well settled which we think applies to this case. Stated in the language of this Court in *U. S. vs. Tynen, 78 U. S., 11 Wall., 88, 92,* it is this: 'When there are two acts on the same subject, the rule is to give effect to both if possible. But if the two are repugnant in any of their provisions, the latter act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the first; and even where two acts are not in express terms repugnant, yet if the latter act covers the whole subject of the first, and embraces new provisions, plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act.'"

Justice Lamar next cites from *Eckloff vs. District of Columbia, 135 U. S., 240,* as follows: "The Court below placed its decision on what we conceive to be the true significance of the act of Congress of 1878. As said by that Court, it is to be regarded as an organic act, intended to dispose of the whole question of a government for this District. It is, as it were, a Constitution for the District. It is declared by its title to be 'An Act to provide a Permanent Form of Government for the District.' It is the system of government. The powers which are conferred are organic powers. We look to the act itself for their extent and limitations. It is not one act in a series of legislation, and to be made to fit into the provisions of the prior legislation, but is a single complete act, the outcome of previous experiments, and the final judgment of Congress as to the system of government which should obtain. It is the Constitution of the District and its grants of power are to be taken as new and independent grants, and expressing in themselves both their extent and limitations. Such we believe is the true view to be taken of the statute."

Justice Lamar then concludes: "Under this view of the objects and purposes of the act of 1878, we think the Court below was correct in holding that the act superseded and repealed by implication paragraph 354 of the *Revised Statutes*, relating to the District of Columbia. It is true there are no express words of repeal in the act of 1878 applied to said paragraph 354. But the whole tenor of the act shows that it was intended to supersede prevoius laws relating to the same subject matter, and to provide a system of government for the District complete in itself, in all respects."

The law relating to the operation of a legislative revision as a repeal by implication is thus stated by the Court in *Murdock vs. Mayor, etc., of Memphis*, in *87 U. S., 20 Wall., 590,* per Miller, J. " The act of 1867 has no repealing clause nor any express words of repeal, If there is any repeal, therefore, it is one of implication. The differences between the two sections " (of the acts of 1789 and 1867) " are of two classes, viz; the change or substitution of a few words and phrases in the latter for those used in the former, with very slight, if any, change of meaning, and the omission in the latter of two important provisions found in the former. It will be perceived by this statement that there is no repeal by positive new enactments inconsistent in terms with the old law. It is the words that are wholly omitted in the new statute which constitute the important feature in the questions thus propounded for discussion. A careful comparison of these two sections can leave no doubt that it was the intention of Congress, by the latter statute, to revise the entire matter to which they both had reference, to make such changes in the law as it stood as they thought best, and to substitute their will in that regard entirely for the old law upon the subject. We are of the opinion that it was their intention to make a new law so far as the present law differed from the former, and that the new law embracing all that was intended to be preserved of the old, omitting what was not intended, became complete in itself, and repealed all

other law on the subject embraced within it. The authorities on this subject are clear and uniform. The result of this reasoning is that the 25th section of the act of 1789 is technically repealed, and that the second section of the act of 1867 has taken its place. What of the statute of 1789 is embraced in that of 1867 is of course the law now, and has been ever since it was first made so. What is changed or modified is the law as thus changed or modified. That which is omitted ceased to have any effect from the day that the substituted statute was approved."

These authoritative adjudications clearly show that, in determining questions of repeal by implication, the legislative intention is the controlling factor, and its ascertainment the paramount object.

The enactment of a general system of government complete in itself, or the revision of a previous statute or statutes, covering the entire subject of such prior enactments, and the consolidation thereof, especially with new provisions, in a single act complete in itself, is regarded as evidence of the legislative intent and purpose to substitute the latter for the former, and consequently is a repeal thereof.

Guided by the foregoing principles, we proceed to examine and consider the act of 1898 and its various provisions. In the first place it is to be observed that it is entitled " An Act Concerning the Establishment of a General System of Free Public Schools." Accordingly we find that it applies generally to all, white and black alike, which had not been theretofore the case. We also find that it provides for both the general and local direction and administration of school affairs throughout the State, through the agencies of a State Board of Education, County School Commissioners—a new feature in Delaware—County School Superintendents, and District School Committees, and also Stated Meetings of the school voters in each district. It also continues all existing school districts and makes provision for the creation of

new ones, and also for the creation of Colored School Districts generally throughout the State—another innovation. It confers the powers and defines the duties deemed essential to the effective administration of the free public schools, in fulfillment of the purposes of the act. It provides for the apportionment of the School Fund allowance to each school district, and also makes provision for the raising of further school revenues by both compulsory and voluntary taxation. It also provides for the qualification and employment of teachers, and numerous other details incidental to the conduct and administration of the schools. In fact the act contains within itself all that the Legislature, as we must presume, deemed needful for an adequate and efficient general free school system in this State.

In respect to the power to build a school house and to raise by taxation the funds necessary therefor—the question in controversy here—ample provision, in our judgment, is made in sections 14, 15, 17, 18, 19 and 20 of the act. Paragraph 4 of said section 14 empowers the school voters in any district at their annual stated meeting, "to resolve whether any sum above that required by law," (through compulsory taxation) "shall be raised for the ensuing year; and if it shall be resolved to raise such an additional amount, to determine by ballot, by a majority of the votes cast, whether such amount shall be raised tax or by subscription." By section 15 the school committees are empowered to build a new school house by the direction of the school voters at their stated meeting; and by sections 18 and 20, said committee are further empowered to levy and collect by taxation the amount resolved to be raised at the stated meeting for the building thereof.

Said general grant of power in said paragraph 4 carries with it the authority to raise any sum for the purposes of the act within the district. The building of a new school house is one of these purposes. There is no limitation upon it in the act itself, and none claimed outside of the act except the alleged limitation in Chapter 70 act of 1861.

The act of 1898, throughout its entire extent, furnishes convincing evidence that its framers had before them, during its preparation, all the various prior school enactments of a general character, from the first free school law of 1829 until that time.    For a careful comparison of said act with said enactments discloses that the act of 1898 has dealt with almost every matter included in each and every of those acts, frequently employing their very language, in other instances changing the language but effecting the same purpose, sometimes modifying old provisions, at other times entirely omitting them, and occasionally adding new features and provisions. As a whole it covers the entire subject of school government and administration included in the various antecedent general acts, and embraces also new features of an important character.

This manifestly deliberate and systematic process of selection and rejection, of modification and innovation, clearly reveals a purpose to revise and consolidate, for general information and convenience, the old and new provisions in one general act or system of school government which should embrace what was preserved of the old and added of the new.

This view seems strengthened by the express provisions of sections 27, 29, 30, 31 and 32, continuing in force provisions of the old legislation not embodied in the new enactment.

In corroboration of the view that the act of 1898 was designed to provide a general system of Free Public Schools and thus to supersede and be a general substitute for the previous legislation, it is important to remember that the General Assembly met in that year, in adjourned session, for the especial purpose of enacting such legislation as might be required by the express mandates, or the effective operation of the new State Constitution of 1897.

It is significant that said act of 1898 was promptly passed in obedience to the express mandate of the new Constitution, contained in Article 10 thereof, viz., "The General Assembly shall provide for the establishment and maintenance of a general and efficient system of free public schools." Pursuant to other directions of said

*Article 10 of the Constitution,* said act provided that the School Fund allowance apportioned among the school districts of the State " shall be used exclusively for the payment of teachers' salaries and for furnishing free text books," and that " in such apportionment no distinction shall be made on account of race or color."

These educational provisions of the new Constitution seem to import a constitutional design that a new and more liberal and efficient general system of Free Schools should be created in lieu of the pre-existing system. The enactment of the law of 1898 is evidence of the legislative intent to fulfill such design.

As the result of our consideration of this Act and of the legislative purpose respecting it, we conclude that it was designed to provide a complete general system for the government and administration of the free public schools of the State, and was intended to be a complete revision of the prior general public school laws, and a consolidation and codification of them with such new provisions as were deemed advantageous, in a single act designed to cover the whole subject in all respects, and to be a substitute for all antecedent general free school legislation not incorporated therein, or continued in force thereby as essential to its effective operation.

The opinion of this Court, therefore, is that the provision of *Section 3, Chap. 70, Vol. 12, Laws of Delaware (Rev. Code 328, Sec. 3)*, limiting the amount which may be raised by tax for the purpose of building or repairing a school house to the sum of $500, has been repealed.

It is ordered that this opinion be certified to the said Superior Court for New Castle County.