FRANCIS I. DUPONT, et al., trading as Francis I. duPont & Co., v. CHARLES MILLS, et al., composing The Board of School Trustees of Rehoboth School District No. 111 of Sussex County.

*(December* 22, 1937.)

LAYTON, C. J., HARRINGTON, RICHARDS, RODNEY and SPEAKMAN, J. J., sitting.

*Tunnell and Tunnell* for plaintiff.

*Houston Wilson* for defendant.

Court in Banc. Case certified by the Superior Court for Sussex County, June Term, 1937.

48

LAYTON, C. J., delivering the opinion of the majority of the Court:

The enabling act provides that any or all of the bonds issued under its authority may be redeemed at the option of the Board of School Trustees at par and accrued interest at any interest period after the expiration of five years from their date; and it provides, further, that if the Board shall elect to redeem any or all of the bonds, the redemption shall be in pursuance of a prescribed notice.

The bonds tendered the plaintiff by the defendant are, specifically, not redeemable prior to their respective maturity dates. Wherefore, the plaintiffs contend that they do not meet the conditions of their bid for them, in that they are not legally issued, direct obligations of the school district.

The precise question presented is whether the permissive language of *Section* 6 of the act, gives absolute discretion and power to the Board to determine, at the time of issuance, the redeemable or non-redeemable character of the bonds, or, whether the language is descriptive of the bonds in the particular that they must be redeemable after the expiration of five years, the discretion then to be exercised as circumstances may warrant.

It will be agreed that the Legislature, under *Article* 10 of the *Constitution*, has, subject to certain excep-

tions, plenary power over free public schools; and that, with respect to the building of a school house and the manner and method of defraying its cost, the defendant school district is subject to that power. It will not be denied that the Legislature had the power to prescribe the kind and character of the security to be issued by the school district to secure the money which it was authorized to borrow.

The general principle, as expressed in *Dillon on Municipal Corporations, 4th Ed., Vol.* 1, 156, is that

"Powers are conferred upon municipal corporations for public purposes; and as their legislative powers cannot * * * be delegated, so they cannot without legislative authority, express or implied be bargained or bartered away. Such corporations may make authorized contracts, but they have no power, as a party, to make contracts or pass by-laws which shall cede away, control or embarass their legislative or governmental powers, or which shall disable them from performing their public duties."

The defendant does not deny the principle. It contends that as the Act confers upon it full power to issue and sell bonds in any amount not exceeding the maximum, and that, as it was vested with discretion with respect to series, dates, maturities, rate of interest, denomination, time and place of payment, registration and whether they should be coupon bonds or not, it was intended by the Legislature to confer the widest discretion upon it to use its special knowledge of local conditions, and its general knowledge of the state of security markets, in the determination of the kind and character of the bond to be issued; and it points to the seemingly permissive quality of the word "may" as supporting its contention.

But, the word, "may," ordinarily permissive in quality, is frequently given a mandatory meaning, and is given that meaning where a public body or officer is clothed by statute with power to do an act which concerns the public interest, or the rights of third persons. In such cases, what they are empowered to do for the sake of justice, or the

public welfare, the law requires shall be done. The language, although permissive in form, is, in fact, peremptory. *Supervisors of Rock Island County v. U. S.*, 4 *Wall.* 435, 18 *L. Ed.* 419; *Mayor, etc., of New York v. Furze*, 3 *Hill* (*N. Y.*) 612. See *State ex rel. Foulger v. Layton et al.*, 8 *W. W. Harr.* (38 *Del.*) 556, 194 *A.* 886.

In *National Bank v. City of St. Joseph*, (*C.C.*) 31 *F.* 216, it appeared that the plaintiff had purchased bonds of the City payable twenty years after date. Before maturity, the city desiring to pay them, deposited the necessary amount of principal and accrued interest in the designated depository. The plaintiff refused to accept payment, and brought suit upon interest coupons. The statute authorizing the issue provided that it should not be construed so as to prevent the city authorities from calling in and paying off the bonds in whole or in part, at any time, and that upon tender of the principal to the holders, interest should cease. The Court, in giving judgment for the defendant, said that the statute clearly empowered the authorities to call in and pay off the bonds; that the exercise of the power though permissive in terms, imposed a duty, which the city officers could not effectually abridge; that the power to issue the bonds was derived exclusively from the legislature, and the laws which conferred the power entered into and formed a part of the bonds themselves; and that the city authorities could not curtail or impair the effect of the condition declared by the statute by issuing bonds of a different tenor.

In *Catholic Order of Foresters v. State*, (*N. D.*) 271 *N. W.* 670, 674, 109 *A. L. R.* 979, an action was brought to determine the right of the Industrial Commission to call bonds issued by the State. The statute provided for the issuance of bonds "payable in not less than ten or more than thirty years from the passage of this act; provided, however, that at the option of the industrial commission they shall be payable at any time after five years from the

date of their issue, upon public notice." *Comp. Laws Supp. N. D.* 1925, § 2290*b*4. The bonds were issued upon the faith and credit of the State, and were specifically secured by first mortgages on real estate deposited with the State Treasurer as trustee. It appeared that the purchaser had stipulated for bonds "without option." They contained no provision for call and redemption prior to maturity, nor that they might not be called. Prior to maturity notice of call and redemption was given. The Court said,

"Clearly the purpose of the option proviso is to enable the Industrial Commission to call the bonds in case the mortgagors take advantage of their pre-payment privilege. Thus the Commission in the public interest is charged with the duty to take up the bonds at any time after five years from the date of their issue should the payments realized from the primary security (the mortgages) and other circumstances and conditions make it advantageous to do so. The amounts that may be thus prepaid by the mortgagors cannot be ascertained in advance, so the statute does not require the Industrial Commission to exercise the option in advance of issue, and since the statute must be considered as part of the bond, there can be no object in requiring the Industrial Commission to recite in the bonds when issued that such bonds may be callable after the expiration of five years from the date of their issue. In short, the option cannot be exercised in advance."

In *Carlson v. City of Helena,* 39 *Mont.* 82, 102 *P.* 39, 17 *Ann. Cas.* 1233, action was brought by a taxpayer to test the validity of proposed bond issues of the City. The statute, authorizing the issue, provided that the bonds should be made payable in not to exceed twenty years, and redeemable at such times as are prescribed in the ordinance directing their issue. Provision was made for a sinking fund, and the City authorities were directed whenever at any time after such bonds become redeemable, the sinking fund equals or exceeds one thousand dollars, to publish a notice of call and redemption of bonds in their numerical order. The city proposed to issue non-callable bonds. The Supreme Court, in affirming the judgment of the lower Court, held that whenever a power is conferred upon a municipality and its mode of exercise pointed out, that prescribed mode must be followed; that the statute was mandatory both as

to the term of the bonds and as to the reservation of the option to redeem prior to maturity, which requirements were limitations upon the power to issue the bonds, disregard of which would render them void; that it was clear that the legislature intended the Council to use a reasonable discretion in fixing the time after which the payment of the debt must begin, so that within reasonable limits it might be the exclusive judge as to the marketability of the bonds. The Court denied the contention of the City that the statute left it to council to say in its discretion, in order to increase the salability of the bonds, that the bonds should not be redeemable at all.

In *City of Brenham v. German-American Bank,* 144 *U. S.* 173, 12 *S. Ct.* 559, 36 *L. Ed.* 390, the ordinance describing the bonds provided that the bonds should be redeemable at any time after five years. The bonds, on their face, provided for redemption after ten years. It was held that the officers of the city had no power to depart from the terms of the ordinance by varying the time limited for redemption.

The defendant cites and relies upon the following authorities: *Turpin v. Madison County Fiscal Court,* 105 *Ky.* 226, 48 *S. W.* 1085; *Snyder et al. v. Board, etc., of La Grange School District,* 144 *Ky.* 256, 137 *S. W.* 1057; *Mitchell v. Knox County Court,* 165 *Ky.* 543, 177 *S. W.* 279; *State v. Gordon,* 217 *Mo.* 103, 116 *S. W.* 1099; *Borner v. City of Prescott,* 150 *Wis.* 197, 136 *N. W.* 552.

In the *Turpin Case,* the *Gordon Case,* and in the *Borner Case,* examination of the respective Acts will disclose that discretion was given to the issuing authorities to determine the maturities of the bonds at the time of their issuance. There was nothing in the Acts to suggest that they were intended to attach to the bonds a redeemable quality upon the passage of a certain time. These cases are distinguishable.

In the *Snyder Case,* the provision was, "running not exceeding thirty years \* \* \* and shall be redeemable at the option of said board." *Ky. St.* § 4481, *Russell's St.* § 5758. The bonds, as issued, were made payable in certain amounts through successive years, and the question was whether, under the statute, they were redeemable at any time at the option of the board. The Court regarded the word "redeemable" as synonymous with "payable." See *United States v. North Carolina,* 136 *U. S.* 211, 10 *S. Ct.* 920, 34 *L. Ed.* 336. It held that the statute simply directed the bonds to be redeemed, that is paid within thirty years, and that discretion was given the board to determine whether they should be issued for a less period than that time. The Court said there was nothing in the statute to justify the contention that, after the board had once exercised an option and had determined when the bonds should be redeemed, that it might thereafter exercise another option and fix a different time for redemption.

The *Mitchell Case* is more nearly in point. There the statute provided for the issuance of bonds "to run not less than five nor more than thirty years, and to be redeemed within that time at the pleasure of the court." *Ky. St.* 1915, § 4307.

A certain portion of the bonds were made payable in ten, fifteen and twenty years, respectively, but the remainder which were made payable in respective amounts in twenty-five and thirty years, were subject to redemption at any time after twenty years. It was held that the qualifying phrase, "at the pleasure of the court" referred to the time the bonds were issued, and that the right to redeem must have then been reserved, or it could not be exercised.

It is to be noticed that in the *Snyder Case,* the statute made no provision for a fixed life of the bonds, and while in the *Mitchell Case* a fixed life of not less than five years was directed, in neither statute was there a provision for

option of redemption after a fixed time and for procedure of call for redemption by notice. To that extent the statutes differ from the one under consideration. But, whether or not, considering the respective statutes, the cases can be clearly distinguished from the instant case, a different view of them is permissible; the Courts there cite no authority; and we decline to be bound by them.

It is obvious, in *Catholic Order of Foresters v. State, supra,* that the fact that real estate mortgages with pre-payment provisions were the primary security for the bonds, was a consideration, and that, in *Carlson v. City of Helena, supra,* the requirement of a sinking fund and the positive direction to call the bonds in numerical order when the sinking fund reached a certain proportion, were considerations in the determination of the respective legislative purpose and intent; but the special considerations appearing in those cases are no more significant of legislative purpose than the provision of the act before the Court, "that if said Board of School Trustees shall elect to redeem any or all of said Bonds as aforesaid, such redemption shall be made in pursuance of a notice." 41 *Del. Laws, c.* 171, § 6.

The Board could not, at the time of issuance, make its election to redeem pursuant to the prescribed notice indicating the bonds to be called, and the method and manner of calling them. The right of election to redeem refers, therefore specifically to a time not less than five years from the date of the bonds. The language of the section, considered as a whole, clearly expresses the legislative purpose. Unless violence be done to plain language, and a vital part of the section ignored, its language cannot fairly be construed as conferring an absolute power and discretion in the Board to determine the redeemable quality of the bonds. The Legislature considered the question of the marketability of the bonds, and provided a certain life of five years. It considered the welfare of the taxpayers as affected by

possible future conditions, and protected them against a non-callable debt. Much was left to the Board's discretion, but the right to issue non-redeemable bonds was not conferred. The provisions of the section, although permissive in form, are mandatory in the sense that a duty was imposed upon the Board to reserve the right to redeem the bonds after the expiration of five years.

█ The conclusion must be that the bonds tendered the plaintiffs were not such as were authorized by the act; and it follows that the plaintiffs were justified in refusing to accept and to pay for them.

█ It is next contended that it was an indispensable condition that the approval of the State Board of Education be obtained before issuing the bonds, failing which the issue is invalid.

The argument is that, as the enabling act, § 13, requires the Special Election to be held "in the same manner as other school Elections," and as *Section* 96 of the *General School Law, Rev. Code* 1935, § 2718, requires the approval of the State Board of Education, such approval is made a condition precedent to the authority of the defendant to hold the Special Election to ascertain the sense of the voters upon the proposed plan.

But, the defendant calls attention to *Articles* 10 and 11 of the *General School Law, Rev. Code* 1935, §§ 2712-2728, and contrasts their provisions with those of the enabling act, and aptly says that if anything is apparent from the enabling act it is, that it conferred upon the defendant Board "all power and authority" to procure a site and to erect thereon and fully to equip a school building, and to take and keep title in its own name; and it pertinently asks, in the face of that legislative power and authority, unlimited and unqualified, what ground is there for contending that, by implication or otherwise, another agency, created

by the same authority and subordinate to it, must also give its approval to the authorized school building program.

Clearly, the Legislature did not intend to subject the defendant Board to the supervisory control of the State Board of Education in carrying into effect the building program authorized by the act. Under the *General Law*, the State Board of Education is supreme in the field of building programs of School Districts. The purpose of the Act was to override or circumvent that Supremacy.

The argument of the plaintiff amounts to this: that the enabling act is in *pari materia* with the *General School Law*, and, therefore, the approval required by the *General Law* is fastened also upon the authority conferred by the enabling act; but, from a comparison of the statutes, it may not reasonably be inferred that the Legislature intended, by the use of the phrase, "in the same manner as other school Elections," to condition the power and authority granted to the defendant Board on the approval of the State Board of Education.

The next contention is that the enabling act is fatally defective in that it did not define the qualifications of the persons entitled to vote at the Special Election required to be held.

The right to vote is not a natural right. It is a franchise dependent upon law by which it must be conferred to permit its exercise. The *Constitution* is silent with respect to the right of franchise at municipal or School District elections. The Act contains no specific provision defining the qualifications of persons entitled to vote at the Special Election required to be held to ascertain the approval or disapproval of the proposed program by the voters of the district; and it is defective in this respect unless it can be said that the provisions of *Section* 131 of the *General School Law, Rev. Code* 1935, § 2753, prescrib-

ing the qualifications of voters at all school elections, are embodied in the act by reference, or under some applicable rule of statutory construction.

The language of the resolution defining the qualifications of persons entitled to vote at the Special Election is the language of *Section* 131 of the *General School Law* adapted to the particular district, but it is not clear why it was thought necessary to define by resolution the right of franchise.

Obviously, the defendant Board was of opinion that the phrase, "in the same manner as other school Elections," contained in *Section* 13 of the enabling act, was comprehensive not only of procedural details but also of eligibility or qualifications of voters, and, therefore, a sufficient specific reference to the *General School Law* whereby to incorporate in the Act its provisions relative to the right of franchise at school elections whether held for the purpose of referendum, or otherwise. The section of the enabling act is, in substance, a copy of the eighth paragraph of *Section* 53 of the *General School Law,* as enacted by *Chapter* 173, *Vol.* 34, *Delaware Laws,* and which is embodied in the *General School Law* as *Section* 103, *Rev. Code* 1935, § 2725. This section, as enacted, was a substitute for the fifth paragraph of *Section* 53 of the *General School Law* as enacted by *Chapter* 160, *Vol.* 32, *Laws of Delaware.* In this paragraph, as in the substituting paragraph, provision was made for a Special Election to be held in the usual places, "and in the same manner as other school elections"; but in the original paragraph found on *page* 515, *Vol.* 32, *Laws of Delaware,* was the provision, "at said election every person qualified to vote at a general election shall be entitled to vote." This provision did not appear in the substituting paragraph for the reason that, in the meantime, by *Chapter* 181, *Vol.* 33, *Laws of Delaware,* the section of the *General School Law,* now designated as *Section* 131 of *Chapter* 71, *Rev. Code*

1935, § 2753, defining the qualifications of voters at all school elections, was enacted.

It appears, therefore, that the use of the phrase, "in the same manner as other school Elections," was with reference to matters of procedure, and not to qualifications of voters. And so it is generally held.

In *State v. Adams*, 2 *Stew.* (*Ala.*) 231, it was held that the phrase, "manner of conducting," was to be understood as referring to the formal part of the election, that is, to the mode of voting, of receiving, registering and computing votes. In *People v. English*, 139 *Ill.* 622, 29 *N. E.* 678, 679, 15 *L. R. A.* 131, the *Constitution, Article* 8, § 5, made provision for the election of county superintendents of schools, "whose qualifications, powers, * * * and manner of election, * * * shall be prescribed by law." Women did not have the right to vote; but the Legislature passed an act, *Laws Ill.* 1891, *p.* 135, now *Smith-Hurd Ill. Stats. c.* 46, §§ 339, 340, conferring the elective franchise on women at any election held for the purpose of choosing any officer under the school laws. It was held that the phrase, "manner of election," indicated merely that the Legislature was authorized to provide by law the usual, ordinary or necessary details required for holding the election and that it gave no authority to the Legislature to enlarge the class of electors. In *People v. Guden*, (*Sup.*) 75 *N. Y. S.* 347, it was held that the "manner" of election did not go to the question of what body of electors shall elect, and did not authorize the Legislature to designate the body of electors entitled to elect the officers in question. *Livesley v. Litchfield*, 47 *Or.* 248, 83 *P.* 142, 114 *Am. St. Rep.* 920, and *Coffin v. Election Commissioners*, 97 *Mich.* 188, 56 *N. W.* 567, 21 *L. R. A.* 662, are to the same effect.

The rule is recognized that a statute may adopt a part or all of another statute by a specific and descriptive reference thereto, *Perkins v. Winslow*, 3 *W. W. Harr.* (33

*Del.*) 188, 133 *A.* 235; but the phrase, "in the same manner as other school Elections," does not refer to the right of franchise at school elections, and the incorporation in the enabling Act of the provisions of *Section* 131 of the *General School Law, Rev. Code* 1935, § 2753, was not accomplished by that reference.

The next question is, whether the provisions of *Section* 131 of the *General School Law* are embodied in the enabling Act under any principle of statutory construction; and the first inquiry is with respect to the purpose and intention of the Legislature in the enactment of the provisions of the section.

For years the school laws of the State were in the utmost confusion, without symmetry or order, and entirely insufficient to secure an efficient administration of a public school system and to afford an equality of opportunity for learning. It was a patch-work system, characterized by hesitation and vacillation, and fostered by opportunism. In some districts, buildings were adequate and schools were efficient; in others, conditions were entirely unsatisfactory and insufferable. The Legislature enacted a comprehensive general law to attain order, efficiency and equality. A State Board of Education was established with wide powers. The supremacy of local boards of school trustees in matters educational was challenged and overthrown. Authority was centralized. *Section* 131, of *Article* 17, of *Chapter* 71, of the *Revision* of 1935, *Section* 2753, is a part of the *General School Law*. The *General Law* provides for special elections in two cases: to raise more money by taxation; and to carry out, by the issuance of bonds, a building program approved by the State Board of Education. The purpose of the section was to define the qualifications of voters at such elections as were within the comprehension of the *General School Law*. It is impossible to assume that the Legislature, in enacting the section as a

part of the *General Law* establishing a complete and uniform school system, intended it, by the mere fact of its existence, to apply to and to be engrafted upon statutes, thereafter enacted, providing for school elections outside of the general law and in derogation of it.

But, the defendant now contends that the act and the *General Law* are in *pari materia,* and, therefore, the provisions of the *General Law* relating to voters' qualifications are embodied in the Act under the familiar rule of construction. The rule is that all consistent statutes which can stand together, though enacted at different dates, relating to the same subject, are treated prospectively and construed together as though they constituted one act. 2 *Suth. Stat. Cons.* 443. The object of the rule is to ascertain and carry into effect the intention of the Legislature, and it proceeds upon the supposition that the several statutes relating to one subject were governed by one spirit and policy, and were intended to be consistent and harmonious in their several parts and provisions; and the rule is applicable only when the terms of the statute to be construed are ambiguous or its significance doubtful. 25 *R. C. L.*

The act was not passed in furtherance of the policy of the *General School Law,* but in derogation of it; and the differences between it and the *General Law* are so marked and pointed as to negative the applicability of the rule of construction urged by the defendant.

It is a matter of common knowledge which may be judicially noticed, that for a number of years the cost of building programs of school districts approved by the State Board of Education has been defrayed in large measure out of State funds, and only in a minor degree has the cost fallen on local districts. Under the act, the School District assumes the entire cost. Under the *General Law,* Boards of School Trustees of School Districts have no power of eminent domain. The power, if necessary to be invoked, is

exercisable by the State Board of Education, and the procedure is regulated by *Section 95, Rev. Code* 1935, § 2717. Under the act, the power is expressly conferred upon the defendant Board, and the procedure is that which is authorized by the act creating the State Highway Department. The *General Law* requires title to land acquired by School Districts to be taken in the name of the State Board of Education. The act authorizes the defendant Board to take and keep title in its own name. Under the *General Law,* Boards of School Trustees of School Districts are required to file with their biennial school budgets of the year in which there is a legislative session, a proposed building program, which, when finally approved by the State Board of Education, becomes the school building plan of the school district for two succeeding years, to be carried out if funds are available; and the State Board of Education may include in its biennial school budget such part of the cost as it deems proper for the State to assume. Architects employed to assist in the preparation of plans and specifications must be approved by the State Board of Education. The enabling Act vests the defendant Board with "all authority and power" necessary to procure a site and to construct and equip a twelve grade school building. The State Board of Education is directed to render to the defendant Board expert advice and assistance in the construction of the proposed building, even though the program is "not to be carried out with funds appropriated by the State, or applied under the direction of the State Board of Education," but the defendant Board is not required to seek such "expert advice and assistance," nor to be governed by such advice, if sought. It may employ its own architect, and adopt its own plans, without the necessity of approval by the State Board of Education. Under the *General Law,* the State Board of Education has the power to create new High School Districts, outside of the City of Wilmington,

but the enabling act requires the State Board to accept and make use of the proposed building, and to allocate to the School District its proportional part of the educational funds of the State so as to support and operate an efficient and adequate school for elementary, grammar and high school students. Under the *General Law,* funds derived from additional tax levies to meet current interest charges and annual payments on bonds issued to carry out building programs, are required to be paid to the State Treasurer, to be deposited by him in a separate account, and to be expended by warrants drawn on the fund by the School District. Under the enabling act, the Receiver of Taxes and County Treasurer of Sussex County is directed to pay such funds directly to the defendant Board, whose receipt "shall operate as a complete discharge to the aforesaid County officer from his responsibility for these funds"; and the funds are directed to be deposited in the Farmers Bank, at Georgetown, "until they are used by the Board of School Trustees" to carry out the provisions of the act. 41 *Del. Laws, c.* 171, §§ 10, 11.

Clearly, the purpose of the act was to enable the defendant Board to acquire a site for a school building in its own name, and to construct thereon and to equip a twelve grade school building according to its own plan and wholly at the expense of the taxpayers of the School District, entirely freed from the restraints and shackles placed upon it by the *General School Law,* and to have conducted for the District a High School regardless of the power reposed by the *General Law* in the State Board of Education to create new High School Districts. The act ousts the State Board of Education of its jurisdiction to determine the necessity or advisability of the creation of new High School Districts, to determine the necessity or advisability of a new school building for this one School District, and to determine the type or plan of the building if a new building

is found necessary or advisable, and it substitutes for the State Board of Education, whose judgment, discretion and power with respect to such matters is made supreme by the General Law, the local board of the district.

Apart from the circumstance that the purpose of the Act was to enable the defendant Board to construct a twelve grade school building, there is no suggestion of consistency or harmony in the provisions of the respective statutes. On the contrary, the defendant seeks its power and authority outside of the *General School Law,* in an act which is directly subversive of the spirit and policy of that law. There is no ambiguity in the Act, and the rule of construction ought not to be applied.

The enabling act is not an amendment to the *General School Law* in any true sense. It does not, by its title, purport to be, nor does the defendant, in its argument, assert it to be an amendment. The purpose of the Act is outside of the scheme of the *General School Law,* and it stands, and was intended to stand, upon its own foundation as a law solely applicable to the Rehoboth School District. An examination of its provisions shows clearly that meticulous care was taken to make it complete and self sufficient, and so plain and clear in its terms that it might not be said that the power and authority granted by it was, in anywise, dependent on the *General Law,* except as guarded and specific reference thereto was made. If and when, under the terms of the act, the bonds shall be issued, and the building constructed and accepted by the defendant, its purpose will have been accomplished, and it will no longer exist as an active and living force in the body of the law. For all practical purposes it will be numbered among the dead.

The duty imposed upon Courts to construe statutes so as to give them effect, if it is reasonably possible to do so, is fully recognized; and Courts, oftentimes, go far afield to avoid the consequences resulting from declaring

invalid a statute, where grave questions of public conven- ience or necessity are involved, a consideration not appear- ing here as the Legislature will convene in twelve months. So important a right as the right of franchise ought not to rest on strained or doubtful construction. It ought to be given or withheld in clear terms.

What the Court is asked to do, is not to construe the Act, but to supply an ommission therein due to the failure to define in the Act the qualifications of those entitled to vote at the Special Election authorized by it, or to incor- porate therein, by specific reference, the provisions of the *General School Law* relative to the qualifications of voters at school elections.

The law is well settled. While the Court may interpret doubtful or obscure phrases and obscure language in a statute so as to give effect to the presumed intention of the Legislature, and to carry out what appears to be the general policy of the law, it cannot, by construction, cure a casus omissus, however just and desirable it may be to supply the omitted provision. 2 *Sutherland, Stat. Cons.*, § 606; *Fouracre v. White*, 7 *Boyce* (30 *Del.*) 25, 102 *A.* 186; and it will make no difference if it appears that the omission on the part of the legislature was a mere oversight, and that, without doubt, the Act would have been drawn otherwise had the attention of the legislature been drawn to the oversight at the time the Act was under discussion. 2 *Sutherland, supra*, § 605; 59 *C. J.* 974.

The last reason assigned for holding invalid and illegal the issue of bonds is that the election authorities failed to allow non-resident property owners of the School District to vote at the Special Election. This is said to constitute a discrimination against that class of property owners who do not live in Rehoboth, a violation of a fun- damental principle of republican government, that there

shall be no taxation without representation, and contrary to the *Federal Constitution.*

Of course, neither the election authorities nor the defendant Board had any authority whatever to define the qualifications of the voters. The resolution of the Board in attempting to define the qualifications by adopting the provisions of 131 of the *General School Law, Rev. Code* 1935, § 2753, was entirely useless if those provisions were engrafted on the act, otherwise, entirely futile. The right of franchise was given or withheld by law, not by resolution of the Board. If it is meant by this contention that, at a municipal or quasi-municipal election held for the purpose of a referendum to approve or reject a proposal to borrow money on the faith and credit of the municipality or district, the *Federal Constitution* forbids, with respect to the elective franchise, a discrimination against non-resident property owners, the soundness of the contention must be denied. The plaintiffs admit that the point was decided adversely to their contention in *Steward v. Jefferson,* 3 *Harr.* 335, but urges that the arguments advanced, but there denied, are sound in principle. No authority is cited in support of the contention, and we have no reason to suppose that a right guaranteed under the *Federal* or *State Constitutions* has been violated.

It is commonly known that the Town of Rehoboth is a summer resort. Its constant population is small. The great part, perhaps, of the taxable property is owned by non-residents. In municipal matters, the Legislature has uniformly recognized the unique position of the town among the municipalities of the State, by conferring the right of franchise, both at ordinary municipal elections and at special elections for the purpose of a referendum, upon non-resident freeholders. Viewed as a matter of abstract fairness, there is force in the argument that non-resident property owners should be allowed to vote at school elec-

tions held in the Rehoboth School District for the purpose of determining whether or not to burden the taxable property of the district with the expense of a school building. That argument is a proper one to be addressed to the Legislature. It is inapposite here.

For the reasons given the issue of bonds was illegal. The plaintiffs are entitled to have returned the money deposited by them; and it is ordered that this opinion be certified to the Superior Court to the end that judgment be entered for the plaintiffs.

I am authorized to say that Judges HARRINGTON and RICHARDS concur in this opinion.

RODNEY, J., dissenting in part:

I concur with the majority of the Court in the first, second and fourth conclusions reached by them, viz. (1) that the school trustees issuing the bonds had no right to bar the statutory right and power of future Trustees to have an option as to whether or not bonds could be redeemed after five years from the date of issuance and in lieu thereof to issue bonds not redeemable before maturity; (2) that the approval of the State Board of Education is not necessary in order to effect the legality of the bond issue in question and (4) that the exclusion of non-resident property holders from the list of qualified electors does not make the bond issue illegal.

I find myself unable to agree with the majority of the Court on the third point, viz., that the act is fatally defective in that it does not define the qualifications of the persons entitled to vote at the special election held as a referendum upon the issue of bonds.

The special act under consideration provides that the referendum election concerning the bonds shall be held "in the same manner as other school Elections." 41 *Del. Laws,*

*c.* 171, § 13. The majority of the Court considers that the words just quoted refer to the method or details of the election and are not broad enough to embrace the qualifications of those entitled to vote and also considers that the Statute is intended to be separate, distinct and complete in itself, and that recourse may not be had to the general act to determine those who may be entitled to vote. It is at this point that I find myself unable to agree. To me it is not absolutely essential that the words "in the same manner as other school Elections" shall embrace the qualifications of voters. I view the special act as, in a sense, amendatory of the general school act and that both refer to the same general subject matter, the special act only changing the general act insofar as it expressly purports to make such changes and that it is competent to look to the general act for the qualifications of voters. With this end in view I desire briefly to review the history of the pertinent school legislation. Disregarding earlier and inadequate educational provisions we find that in 1921, by *Chapter* 160, *Vol.* 32, *Laws of Delaware,* an elaborate school code was adopted by the Legislature and is now found, as amended by subsequent legislation, as *Chapter* 71 of *Revised Code* of 1935. By the *School Code* the Trustees of a School District must submit a proposed building program to the State Board of Education and when such program is approved may issue bonds in a prescribed amount provided such issue of bonds is approved at a special referendum election called for the purpose of passing upon such issue of bonds. *Section* 66 of the *School Code,* as added by 33 *Del. Laws, c.* 181, now found as *Section* 2753 of *Revised Code* of 1935, provides

"In every School Election in any School District * * * whether held for the purpose of a referendum or to elect school officers, or otherwise, every citizen, male or female, resident of said District, who would be entitled at the time of the holding of the School Election, to register and vote in any election District of which said School District * * * is a part at a General Election, if such General Election were to be held at the time of such School

Election, shall be deemed to be a qualified voter and entitled to vote at such School Election" regardless of the fact whether he or she was registered at the time.

This was the situation in 1937 when the Legislature passed the act in question. The Legislature knew of the *School Code* and all of its provisions.

It seems to me that the *Act* of 1937 must be considered in connection with other pertinent legislation. The very existence of the School District and of the Board of Trustees controlling it must be found in prior legislation creating them. To me it is apparent that the special act is in derogation of the *School Code* and intended to change it in but two particulars, viz.: the erection and financing of the school building itself. In all other particulars there seems to me the intent to fit the special act into the Code and to leave the School District as a component part of the general school system of the State.

It is especially provided by the special act that the State Board shall render all expert advice and assistance in the erection of the new school, and by *Section* 4 of the special act it is made the duty of the State Board to accept and make use of the new building, when completed, as a part of the public school system of the State. Certainly when the building is completed it fits into the general scheme of education and all future elections held in that very building will automatically be under all the provisions of the *General Law*.

When the Legslature by the special act says the election shall be held "in the same manner as other school elections" it seems clear to me that by the use of the word "other," an intention is indicated to designate the election then being spoken of as a "School Election," and the *General School Code* provides for the qualification of voters "in every School Election in any School District."

The special act withdrew from the State Board the

power of approval of the building program of School District 111 of Sussex County; it increased the power of the local Board to the same extent. Otherwise the two Boards and their respective functions remained the same. Because I think that the special act is in derogation of the *School Code* merely in the erection and financing of the building and is to that extent amendatory of the *General Law,* so I think that the provisions of the *General Law* not affected by the amendatory provisions may be looked to and called upon to put the special act into effect.

Where legislation is adopted in reference to an incorporated district or political subdivision and no mode is prescribed in which it shall be performed, recourse may be had to the general law governing such incorporated district or political subdivision. *Oregon v. Jennings,* 119 *U. S.* 74, 7 *S. Ct.* 124, 30 *L. Ed.* 323; *People v. Dutcher,* 56 *Ill.* 144; *Chicago & I. R. R. Co. v. Mallory,* 101 *Ill.* 583.

The foregoing construction is the more readily adopted by me for the reason that by it full measure of validity may be given to the special act as carrying out the intent of the law making branch of the State Government.

I am authorized to say that Judge SPEAKMAN concurs in the views herein expressed.