MARJORIE C. BRENNAN, individually, and on behalf of all other Tax-
payers of the Mount Pleasant Special School District similarly
situated, and who may wish to join with her in this action and
contribute to the expenses of this action,

*vs.*

CRAYTON K. BLACK, President, JOHN F. HEINEY, JANE McADAM,
VERNAL R. HARDY, and ROBERT V. HUBER, comprising the
Board of Education of Mount Pleasant Special School District;
C. EARL BAUM, JOHN J. HARTNETT, CLAYTON S. HARRISON, JR.,
and ROBERT A. DERRICKSON, comprising the Board of Assess-
ment for New Castle County; and GEORGE R. CLARK, Receiver
of Taxes and County Treasurer of New Castle County and as
such Collector of Taxes for Mount Pleasant Special School
District.

*Supreme Court, April 27, 1954.*

Southerland, C. J., and Wolcott and Tunnell, JJ., sitting.

*Stewart Lynch* and *Abraham Hoffman,* Wilmington, for plaintiff.

*H. Albert Young,* Attorney General, *Stephen E. Hamilton, Jr.,* Deputy Attorney General and *Robert V. Huber,* Wilmington, for defendants comprising the Board of Education of Mount Pleasant Special School District.

*William S. Satterthwaite* and *Clyde M. England,* Wilmington, for defendants comprising the Board of Assessment for New Castle County and the Receiver of Taxes of New Castle County.

Southerland, Chief Justice, for the court: The plaintiff Marjorie C. Brennan, is a resident and taxpayer of Mount Pleasant Special School District in New Castle County. She seeks in the court below to enjoin the collection of a school tax proposed to be levied upon her property. The defendants are (1) the Board of Education of the District, (2) the Board of Assessment of New Castle County, and (3) the Receiver of Taxes of New Castle County.

Upon numerous grounds plaintiff asserts the invalidity of the statutes authorizing the tax, the illegality of the proceedings by which it was levied, and the illegality of the assessment upon which it is to be based.

The general factual background of the case is as follows:

The Mount Pleasant School District is a special school district in New Castle County. Its Board of Education is appointed by the Resident Judge of the county. 14 *Del.C.* § 505.

By the provisions of 14 *Del.C.* § 1902 any school district is empowered to levy taxes for school purposes upon the assessed value of real estate in the school district. The tax may be levied upon the basis either of a specified amount or a specified rate, as determined by the Board of Education and approved by the voters at an election called for the purpose.

By the provisions of 14 *Del.C.* § 2102, the school board of any district may, with the approval of the State Board of Education, issue bonds to carry out a plan for the acquisition of land or the construction of buildings for school purposes. Before any such bonds may be issued a special election in the district must be held to obtain the approval of the voters. 14 *Del.C.* § 2120.

By an election held November 17, 1949 the voters of the Mount Pleasant School District approved a change in the basis of the tax levy from a specified amount to a specified rate of taxation of 50 cents per $100 of assessed valuation of real estate. Subsequently, by two elections held on the same day, October 3, 1953, the voters approved an increase in the specified rate of taxation to 75 cents and also approved a proposed bond issue of $800,000 for the construction of new school buildings.

At the time of these last two elections the Board of Assessment of New Castle County, which is charged with the duty of valuing and assessing all real estate in the county for county and school taxation, was engaged in a revaluation and reassessment of such property. In May 1951, pursuant to a resolution of the Levy Court of New Castle County, it employed The J. M. Cleminshaw Co. of Cleveland, Ohio, an appraisal firm, to make a complete revaluation and reassessment of real estate in rural New Castle County and a partial reassessment of real estate in the City of Wilmington.

The reassessment was duly made. In November 1953 plaintiff was notified that the valuation of her property had been increased to $45,000. Thereafter this suit was filed. Unless enjoined by the court, the new assessment will constitute the basis for county and school taxes for the fiscal year beginning July 1, 1954.

The validity of all these proceedings is challenged by the plaintiff on numerous grounds. She asserts (1) the unconstitutionality of the statutes authorizing the levying of the school tax, (2) the illegality of the proceedings by which the tax was authorized, and (3) the illegality of the entire assessment in New Castle County upon which the tax is to be based.

The parties have stipulated the facts, and they are set out in the certification. Upon these facts there have been framed nine questions of law, which by proliferation have become seventeen. They fall into three groups.

I. Questions touching the constitutionality of certain provisions of the school laws.

II. Questions touching the validity of the election held in the Mount Pleasant Special School District.

III. Questions touching the validity of the assessment of real estate for county and school taxation by the board of assessment of New Castle County.

We take up the questions in the order presented. Such additional facts as are pertinent will appear hereafter at appropriate places in the opinion.

I. Questions touching the constitutionality of certain provisions of the school laws.

*Question 1(a):*

*Is 14 Del. Code 1953, § 1902 unconstitutional as an invalid delegation of legislative power to school districts in that it empowers said school districts to levy and collect taxes for school purposes upon the assessed value of real estate in said school districts, as determined and fixed for county taxation purposes?*

Plaintiff contends that the delegation of taxing power to an appointive administrative body is unconstitutional. The argument is that the power of taxation is a legislative power; that school districts are not municipal corporations exercising general legislative functions, but mere administrative agencies of the state created solely for the purpose of a convenient and effective administration of the school system, *Coyle v. McIntire, 7 Houst.* 44, 89, 30 *A.* 728; *In re School Code of* 1919, *7 Boyce* 406, 411, 108 *A.* 39; and that the power of taxation, which is inherently legislative in nature, may not be delegated to such an administrative board. Plaintiff invokes the general principle stated in 51 *Am.Jur. "Taxation",* § 114.

■ The foundation of this principle, and of plaintiff's argument, is the doctrine of separation of powers. This doctrine broadly stated is that a function inherently legislative may not be delegated to the executive or to the judiciary; and similarly, functions executive or judicial in nature may not be delegated to one of the other branches of government. The instant case concerns the delegation of a legislative function to an administrative body—an arm of the executive branch.

We have recently had occasion to examine the extent to which the doctrine of separation of powers prevails in Delaware and have held that it does not obtain in full force as it does in some of the states. See *Opinion of the Justices, — Terry —,* 88 *A.2d* 128; *Trustees of the New Castle Common v. Gordy, — Terry —,* 93 *A.2d* 509.

In the *Opinion of the Justices* we considered statutes conferring executive duties upon the judiciary. We said that the chain of such legislative enactments over a long period of time afforded a practical construction by the people of the state through their representatives of the doctrine of separation of powers, which had been reinforced by tacit recognition of bench and bar.

The case before us supplies another example of such a practical construction, and—what is even more important—approval, as well as tacit recognition, by the courts.

■ From the very beginning of public education in this State the power of school districts to levy taxes for school purposes has been asserted by the General Assembly, acquiesced in by the people, and sustained by the courts. The *Act of* 1830, 8 *Del.L.Ch.* 21, § 5, contains a provision delegating the power of taxation to school districts. In *Steward v. Jefferson,* 1841, 3 *Har.* 335, the constitutionality of this act was assailed on the ground, among others, that the power of taxation could not be so delegated. The question was reserved by the Superior Court for the Court of Errors and Appeals. That court held, although without opinion, that the act was constitutional.

■ The opinion of the Court en Banc in *Husbands v. Talley,* 1901, 3 *Pennewill* 88, 47 *A.* 1009, sketches the development of the school laws of this state from colonial times. It shows clearly that

after the adoption of the Act of 1830 the General Assembly continued to confer the power of taxation upon the school districts.

After the adoption of the new School Code of 1919 the Governor sought and obtained the opinion of the Chancellor and the Judges with respect to its constitutionality. *In re School Code of* 1919, *supra.* Among other objections it was urged that legislative power had been unlawfully delegated to the school districts. The precise question here presented, that of the delegation of the power to tax, was not specifically discussed; but the code was held to be constitutional.

In *Mayor and Council of Wilmington v. State ex rel. Du Pont,* 5 *Terry* (44 *Del.*) 332, 57 *A.2d* 70, the power of the Wilmington Board of Education (a non-elective school board) to determine the amount to be collected by taxes for school purposes in the City of Wilmington was assailed and was upheld by the Supreme Court. The constitutional question was not raised by counsel or noticed by the court; but the case is another instance of the long continued and unchallenged right of the General Assembly to delegate to school districts the power of taxation.[1]

In this State the legislative power to delegate the right to tax to the school districts is analogous to the power to delegate the right to counties and municipalities of the state. As to them, we suspect it has never occurred to any one to question it.

But at this point plaintiff advances an attempted distinction, as respects the delegation of the taxing power, between public bodies corporate, such as municipalities, and public bodies non-corporate and administrative only. Until comparatively recent times school districts were incorporated. Hence, says plaintiff, the principle of long and unquestioned exercise of power does not apply to school districts. This for the reason that it is constitutional, according to plaintiff, to delegate the taxing power to public bodies corporate, but unconstitutional to delegate it to unincorporated bodies. But what

---

1. This case is perhaps distinguishable from the case at bar in that no referendum of voters upon the tax is required in the City of Wilmington. Whether or not such a referendum is a necessary adjunct to the delegation of the power of taxation to an appointive board is a question not before us.

reason can there be to make such a fine-spun distinction? The question before us is the fundamental one of the constitutional power of the General Assembly to confer the power of taxation upon public bodies. If, through an asserted power too firmly entrenched by time to be dislodged, the Legislature may confer the taxing power upon a public body corporate, why not upon a public body non-corporate? What is the special bearing of the corporate form upon the constitutional question? We think the attempted distinction wholly unsubstantial.

Plaintiff leans heavily on the case of *Wilson v. Philadelphia School District*, 328 *Pa.* 225, 195 *A.* 90, 113 *A.L.R.* 1401. There the Supreme Court of Pennsylvania denied the right of the Legislature to delegate the power of taxation to an appointive school board. The case for the application of the doctrine of the separation of powers is in that opinion forcefully and persuasively presented. But we think the question is no longer an open one in this state. In effect it was set at rest more than one hundred years ago by the case of *Steward v. Jefferson, supra*. It is too late at this date to question the power of the General Assembly to confer upon local school districts the power of taxation.

We hold that the statutes conferring upon school districts the power of taxation are not unconstitutional as a delegation of legislative power.

*Question 1(b):*

*Is 14 Del. Code 1953, § 1902 unconstitutional by reason of Art. X, § 1, of the Constitution of the State of Delaware, Del.C. Ann., requiring a uniform system of free public schools and Art. VIII, § 1, of said Constitution requiring all tax to be uniform?*

The argument in support of this contention is diffuse, and we have had some difficulty in stating it succinctly. It appears to proceed as outlined in the following paragraph:

*Art. X, § 1* requires the system of education to be established by the General Assembly to be "general". The *Debates of the Con-*

*stitutional Convention of 1897* show that "general" means "state-wide and uniform". The present administration of the school laws through school districts has not achieved the required uniformity. The districts are only historical accidents. In particular, the system of taxation, to be state-wide and uniform, must be uniform throughout the State. Since § 1902 fixes no minimum or maximum rate of taxation in the school districts, the result is unequal taxation in the various districts. Hence the tax system is not uniform and the provisions of 14 *Del.C.* § 1902 are unconstitutional.

The development of this argument is not wholly clear to us. In some portion of her brief, plaintiff appears to assail the whole system of administering the educational system through local school districts. Statistics and other data are submitted tending to show that the total amounts of money allocated to the various districts by the State, and the rates of taxation prevailing therein, differ greatly. From this it is suggested that uniformity in the school system does not exist.

Plaintiff does not appear to push this argument to the length of saying that the entire school system of the State must be overthrown. It appears to us from the oral argument that the substance of her objection is the lack of uniformity in the rate of taxation in the different districts.

Plaintiff's argument ignores the fundamental basis of the State's educational system. This basis consists of the establishment by the General Assembly of minimum standards of financial support and of administration of the school system throughout the State, supplemented by additional local financing to the extent approved by the local districts. The *Debates of the Constitutional Convention of 1897*, referred to by plaintiff, lend no support whatever to the suggestion that the members of the constitutional convention, in seeking to establish a state-wide educational system, were attempting to do away with the local school districts or the raising of additional school funds in those districts in such amounts as they might determine.

Uniformity in administrative matters was no doubt sought and, as is well known, has now been largely achieved. But uniformity

in respect of local taxation was not envisaged; indeed, the opposite inference is the reasonable one.

There is no constitutional requirement that the rate of taxation in the local districts shall be uniform. The requirement for uniformity in the rate of taxation, contained in *Art. VIII, § 1 of the Constitution,* is specifically limited to "the same class of subjects within the territorial limits of the authority levying the tax." The opinion in the *School Code case, supra [7 Boyce* 406, 108 *A.* 42], expressly holds that as to school taxes " 'the territorial limits' " referred to in the Constitution are the limits of the school district levying the tax.

We find no substance in this objection.

*Question 1(c) is as follows:*

*Is 14 Del. Code 1953, § 1902 unconstitutional as an invalid delegation of legislative power by reason of the omission therein of an adequate standard or standards for the guidance of said school districts in fixing the tax rate in said districts?*

The argument here is that the policy of the General Assembly to fix maximum and minimum rates of taxation in the several school districts is an omission to fix standards by which an administrative body must be governed in administering a statute. The argument appears to be that even though the power to tax may be delegated to a school district, such power must be limited by some standard, that is, by the fixation of a maximum or minimum rate of tax. But if the power of taxation may be delegated, it is difficult to see why the power to determine the amount to be raised and the rate of taxation may not be delegated. Unless specifically withheld, these powers follow as necessary elements of the power to tax. Such has been the uniform practice in this State for many years. The case of *Husbands v. Talley, supra,* impliedly recognizes the principle that the General Assembly need not impose limits upon a school district's tax levy. It holds that the *Act of May* 12, 1898, 21 *Del.L.Ch.* 67, repealed by implication the limitation theretofore imposed by law upon the amounts to be raised by taxation in the school districts.

Referring to the provisions of *Paragraph* 4 *of Section* 14 *of the Act of* 1898, conferring the power to raise "any sum above that required by law", the court said [3 *Pennewill* 88, 47 *A.* 1013]:

> "Said general grant of power in paragraph 4 carries with it the authority to raise any sum for the purposes of the act within the district."

█ Once again, we think it too late now to question the power of the General Assembly in this regard.

Moreover, the authorities cited in support of the argument that the Legislature must fix a "standard" of taxation, i. e., a maximum or a minimum rate, are not in point. The case of *Hoff v. State,* 9 *W.W.Harr.* (39 *Del.*) 134, 197 *A.* 75, has no bearing upon the matter. It deals with a statute enacted under the police power regulating the business of conducting beauty shops, and holds that the failure to prescribe standards of regulation of the business is an unconstitutional delegation of legislative power. The case of *Mayor and Council of City of Hoboken v. Martin,* 123 *N.J.L.* 442, 9 *A.2d* 332, 334, is likewise not in point. It concerns a statute levying a gross receipts tax upon public service corporations and directing the State Tax Commissioner fairly and equitably to apportion the proceeds of the tax among the municipalities in which any property of such corporations might be located. The instant case concerns a wholly different question, viz: the power to delegate to local school districts the right to fix the tax rate.

We are of opinion that the assailed statutes are not unconstitutional for failure to impose limits upon the taxing power.

*Question 2:*

*Are 14 Del. Code, 1953, Sections 1903 and 1911 and 2120 unconstitutional as an invalid delegation of legislative authority by reason of the provision that a special election be held in the school district as a condition to the levying and collecting of additional school taxes and the provision that a special election be held in the school district as a condition to the issuance of bonds by the Board of Education?*

■ The question must be answered in the negative in the light of the principles discussed in the answer to Question 1(a). Plaintiff's argument is built upon the opinion in *Rice v. Foster, 4 Har. 479,* holding unconstitutional an act providing for local option in respect of the sale of intoxicating liquors. So far from supporting plaintiff's contention, the opinion holds to the contrary. In defense of the statute there before the court, *Steward v. Jefferson, supra,* relating to taxation by local school districts, was cited. Chief Justice Booth rejected the argument and in so doing reaffirmed the power of the legislature to provide for local school elections in respect of taxation. He said, 4 *Har. at pages* 495-496:

> "Legislative power is the power of making laws. The making of a law prescribing by what persons, or by what body, when, and in what manner, taxes shall be laid and collected, is the exercise of legislative power. But the making of a resolution, or order, or the determination or direction, by the persons or body appointed for such purpose by law, that taxes shall be laid and collected, is simply the execution of an authority granted by statute."

We are of opinion that the provisions for local school elections in respect of taxation constitute a lawful exercise of the powers of the General Assembly.

*Questions 3(a) and 3(b) are as follows:*

3. (a) *Were the elections which were held on October 3, 1953 pursuant to Title 14, Delaware Code without use of a list of qualified voters valid in the light of Article V, § 2, Constitution of Delaware?*

(b) *Is 14 Del. Code, § 1953, insofar as it defines the qualifications of voters at school elections, unconstitutional as a violation of Article V, § 2, of the Constitution of the State of Delaware?*

These questions raise but one point, whether the school election statutes prescribing the qualifications of voters are unconstitutional in that they do not require registration as a qualification to vote.

The pertinent constitutional provisions are these:

*Article V, § 2 of the Constitution* provides in part as follows:

"Every male citizen of this State of the age of twenty-one years who shall have been a resident thereof one year next preceding an election, and for the last three months a resident of the county, and for the last thirty days a resident of the hundred or election district in which he may offer to vote, and in which he shall have been duly registered as hereinafter provided for, shall be entitled to vote at such election in the hundred or election district of which he shall at the time be a resident, and in which he shall be registered, for all officers that now are or hereafter may be elected by the people and upon all questions which may be submitted to the vote of the people; * * *."

*Section* 4 of the same *Article,* dealing with the subject of "Registration of voters", provides as follows:

"Registration shall be a pre-requisite for voting only at general elections, at which Representatives to the General Assembly shall be chosen, unless the General Assembly shall otherwise provide by law."

Plaintiff's argument is that the first quoted section prescribes registration as a qualification for voting "upon all questions which may be submitted to the vote of the people;" that a school board election is a question submitted to popular vote within the meaning of *Article V, § 2*; that this requirement of registration conflicts with *Section* 4 of the same *Article* limiting the requirement of registration to biennial elections; and that the conflict should be resolved by holding that the first provision overrides the later one.

■ Of course, if there appeared a possible conflict between the two constitutional provisions, it would be our duty to attempt by construction to reconcile them. But on analysis plaintiff's supposed conflict disappears. Registration is not a "qualification"; it is only evidence of qualification. This question was presented to the Court of Chancery in the case of *McComb v. Robelen,* 13 *Del.Ch.* 157, 116

*A.* 745, 746. Chancellor Wolcott considered the statutory provision as it then existed, *Vol.* 32, *Del.L.Ch.* 160, providing for the election of boards of education of special school districts " 'by all qualified voters thereof' ". He observed first, that ever since the state had had a constitutional provision providing for the registration of voters, the provisions of the school law regulating school elections had never specified registration as one of the qualifications of a voter at such elections. Thus women had been allowed to vote prior to the adoption of the XIX *Amendment to the Federal Constitution.*

Passing to the main point in the case, namely, whether registration was, under our statute, a "qualification" to vote at school elections, he said:

> "When we speak of the qualifications of a voter, we mean to refer to those things which must exist as going to make of him a voter, as conferring on him the absolute right to be placed among the class of persons which the law creates and calls voters. Registration, however, means an entirely different thing. It rather refers to the idea of evidencing the existence of things which constitute a voter, a recording of the fact that the individual in question possesses the designated qualifications of a voter."

We are in accord with this holding. Hence the supposed conflict between *Sections 2 and 4 of Article V* does not exist.

If there were any doubt upon the matter, it would be resolved by the *Debates of the Constitutional Convention of 1897.* These show conclusively that registration was not to be made a statutory requirement for voting at municipal or school elections. See the *Debates, Vol.* 5, *pp.* 2983-2987; *pp.* 2992-2997; *pp.* 3004-3008.

And in *DuPont v. Mills,* 9 *W.W.Harr.* (*39 Del.*) 42, 58, 196 *A.* 168, 175, 119 *A.L.R.* 174, the Court en Banc said:

> "The Constitution is silent with respect to the right of franchise at municipal or School District elections."

We are of opinion that the lack of a list of registered voters at the Mount Pleasant School elections did not invalidate the

election, and that the applicable statute, 14 *Del.C.* § 1953, does not violate *Art. V, § 2 of the Constitution.*

#### II. Questions touching the validity of the election held in the Mount Pleasant Special School District.

*Questions 4(a), 4(b), and 4(c):*

4. (a) *Did the notice of the tax election held November 12, 1949, comply with the requirements of § 2738, Rev. Code of 1935, as amended 47 Del.Laws, Ch. 303, § 1; and if not, did such failure to comply render such election void and invalid?*

(b) *Did the notice of the tax election held October 3, 1953, comply with the requirements of 14 Del.Code, § 1904; and if not, does such failure to comply render such election void and invalid?*

(c) *Did the notice of the bond election held October 3, 1953, comply with the requirements of 14 Del.Code, § 2120, and if not, does such failure to comply render such election void and invalid?*

Plaintiff asserts that the notices given by the Board of Education of the three school elections at the Mount Pleasant District are all insufficient to comply with the statutory requirements.

As concerns the election of November 12, 1949, to change the method of tax collections from a specified amount to a specified rate of 50 cents and as concerns the elections of October 3, 1953, to increase the rate to 75 cents, the applicable statutory provision for notice is found in 14 *Del.C.* § 1904, derived from 47 *Del.L.Ch.* 303, § 1:

> "Notice of the election under section 1903 of this title shall be given by notices posted on the door of the school house where the election is to be held, at least 10 days before the day of the election and by such advertisement in newspapers of the district or county as, in the judgment of the School Board of the District, will give notice to the voters of such election. In such notice, the amount to be raised or the proposed rate of taxation and the purpose or purposes of the proposed additional taxes shall be stated."

As concerns the election of October 3, 1953, to authorize the bond issue, the applicable provision for notice is found in 14 *Del.C.* § 2120. After requiring that advertisements be published in two newspapers of the county at certain times prior to the election, the statute provides:

"In all of such advertisements and notices the amount of bonds proposed to be issued and the purposes and reasons therefor shall be set forth plainly and in detail."

The following is the text of the notice of the election of November 12, 1949:

"The purpose of the special election will be to vote on whether the Board of Education of Mt. Pleasant Special School District shall be authorized to levy and collect taxes by a specified rate instead of by a specified amount.

"The specified rate is to be 50 cents per $100.00 of assessed valuation which is the rate now levied to collect authorized amounts. This referendum if favorable, will supersede all previous referenda.

"The purpose of a change in tax collection to a specified rate is that a rate will automatically provide more income as new buildings and developments increase the total assessment valuation. More income will be needed to meet the cost of increasing population, building and operations than is now provided by the present referenda."

It is said that this notice is defective in that it fails to state the purpose of the additional taxes to be levied if the change in rate should be authorized.

It is to be noted that the proposal was not one to raise additional funds immediately, since the rate was not in fact to be changed. The increased revenue expected depended upon the future growth of the community, and its expenditure depended upon future needs. Hence the specification of the purpose to which the increased income was to be devoted necessarily had to be stated in the most general terms.

This was done. We think that the notice was a substantial compliance with the terms of the statute.

The notice of the election of October 3, 1953, to raise the rate to 75 cents provided in part as follows:

> "Notice is hereby given that a special election will be held on October 3, A.D. 1953, in the Mount Pleasant Special School District, Brandywine Hundred, New Castle County, Delaware, pursuant to a Resolution duly adopted on September 10, 1953, by the Board of Education of said school district, in accordance with the provisions of Chapter 160, Volume 32 of the Laws of Delaware and Chapter 303, Volume 47 of the Laws of Delaware, in order to permit the voters of said school district to vote for or against an increase in the rate of taxation, said increase amounting to twenty-five cents per hundred dollars of assessment of real estate thereby making the rate of taxation seventy-five cents per hundred dollars of assessment of real estate in said district.

> \* \* \*

> "The income from the additional tax is to be used to finance the cost of servicing a new bond issue in the amount of $800,000.00, and for operating expenses."

The notice of the second election of October 3, 1953, to authorize the bond issue, provided in part as follows:

> "Notice is hereby given that a special election will be held on October 3, 1953, A.D., in the Mount Pleasant Special School District, Brandywine Hundred, New Castle County, Delaware, pursuant to a Resolution duly adopted on September 3, 1953, by the Board of Education of said school district in accordance with the provisions of Chapter 337 of Volume 49 of the Laws of Delaware, and Chapter 21 of Title 14 of the Delaware Code of 1953, in order to permit the voters of said school district to vote for or against an issue of bonds of said school district of the aggregate principal amount of $800,000.00.

> \* \* \*

"The bonds are to be issued to finance the cost of constructing a new school building or buildings containing twenty-five classrooms, land and equipment, three cafeteria-general purpose rooms, two multi-purpose rooms, a library, and a music room."

These two elections, though held under different provisions of the law, were in effect one. The primary purpose of the elections was to authorize a bond issue of $800,000 and to finance it by increasing the tax rate from 50 cents to 75 cents. It was essential that the voters receive notice, first, of a proposed increase in the tax rate; second, of the amount of the proposed bond issue and its purpose; and third, of the purpose to which the proceeds from the increased tax rate are to be devoted.

Plaintiff criticizes the notices for failure to spell out in more detail the allocation of the additional revenue to be raised. The notice of the bond election plainly stated that the proceeds of the bonds were to be devoted to the construction of a new school building or buildings containing a certain number of rooms to be used for specified purposes, and that the increased revenue to be derived from the increased rate was to be used to finance the bond issue and to meet operating expenses. We think these notices adequate to apprise any taxpayer of the general purpose to which the revenue was to be devoted. It would be unreasonably burdensome to require detailed financial data to be embodied in the notice. An itemized specification of proposed expenditures is not required by the statute. *McComb v. Dutton, 2 W.W.Harr. (32 Del.)* 255, 256, 122 *A.* 81.

We hold that the notices of October 3, 1953 elections were a sufficient compliance with the applicable statutes.

*Questions 5(a) and 5(b) are as follows:*

5. (a) *Did the type and form of ballot supplied for the use of voters in the tax election held October 3, 1953, comply with the provisions of 14 Del.CodeCh. 19, § 1908, and if not, did the failure to comply render such election void and invalid? And, further, was the voting procedure utilized at such election in violation of Article V, § 1 of the Delaware Constitution; if so, does such violation render such election void and invalid?*

(b) *Was the type and form of ballot and voting procedure employed in the bond election held October 3, 1953, improper and in violation of the provisions of 14 Del.Code, § 2120, and Article V, § 1 of the Delaware Constitution; if so, does such violation render such election void and invalid?*

The form of ballot for use at tax elections held under the provisions of 14 *Del.C.* § 1903 is prescribed by 14 *Del.C.* § 1908 which reads as follows:

"For an election under section 1903 of this title, the vote shall be by ballot on which is written or printed:

"For additional tax ☐

"Against additional tax ☐."

The form of ballot for bond elections held under 14 *Del.C.* § 2120 is prescribed by that section which provides:

"At the election, at each voting place there shall be provided a sufficient number of ballots on which shall be written or printed the words 'for the bond issue,' and an equal number of ballots on which shall be written or printed the words 'against the bond issue,' and each voter shall be entitled to receive both of said ballots, one of which the voter may deposit as his ballot, but any voter may prepare his own ballot and deposit that in lieu of the ballot provided."

It appears that for the purpose of the tax election of October 3, 1953, the Board of Education of the district provided two ballots. Upon one of these was printed "for the additional tax", followed by a printed box; and upon the other was printed "Against the additional tax", followed by a printed box. These ballots were alike in size and color. Every voter at the tax election was furnished with a copy of each. The voter then took the ballots to an enclosed booth in which pens, pencils and waste baskets were provided, and upon leaving the booth placed his or her ballot in an enclosed, locked ballot box and then left the polling place.

It is said that the procedure of having two ballots instead of one was in violation of the statutory requirement, and it is further argued that the procedure is inconsistent with an implied constitutional requirement of a secret ballot at all elections.

We agree with plaintiff that the statute prescribes the use of a single ballot, that is, one piece of paper, and that the action of the board in providing two ballots was not a strict compliance with the law.

Even so, it does not follow that the election is void. This is a case for the application of the rule that minor irregularities in the conduct of an election unaccompanied by fraud or unfair dealing, and not affecting the result, will not void an election otherwise valid. 18 *Am.Jur., "Elections"* § 206; *McComb v. Dutton, supra.* In the case of *Altgelt v. Callaghan, (Tex.Civ.App.)* 144 *S.W.* 1166, it appeared that two ballots instead of the one required by statute had been furnished the voters at a municipal election. Conceding that there had been a technical departure from the requirement of the statute, the court, applying the rule referred to, inclined to hold the election void.

We think the election should not be set aside on this ground. There is no suggestion of any fraud or unfairness in the voting, or any suggestion that the departure from the statutory mandate could possibly have affected the result.

The second argument is based on the language of *Art. V,* § 1 of the Constitution relating to the conduct of general elections. It provides:

> "The general election shall be held biennially on the Tuesday after the first Monday in the month of November, and shall be by ballot; but the General Assembly may by law prescribe the means, methods and instruments of voting so as best to secure secrecy and the independence of the voter, preserve the freedom and purity of elections and prevent fraud, corruption and intimidation thereat."

Arguing that the quoted language is a declaration of public policy with respect to the secrecy of all elections in the state, plaintiff says

that the use of the two ballots had the effect of destroying the secrecy of the ballot which the General Assembly is required to preserve.

 Once again it is to be observed that the quoted section applies only to general elections, not to school or municipal elections. For aught that is contained in the Constitution, the General Assembly might authorize a *viva voce* vote at a school election. *Moss v. Riley,* 102 *Ky.* 1, 43 *S.W.* 421. But even if we assume that the general policy of the law favors a secret ballot, plaintiff's position is not helped. Not only is there nothing to show that the use of the two ballots destroyed secrecy in voting, but on the contrary it affirmatively appears that the procedure adopted was such as to insure a secret ballot. It is also to be observed, as appears from the stipulation of facts, that two members of a group of taxpayers opposing the increase in tax rate and the proposed bond issue participated in the conduct of the election and one of them was actually in charge of the ballot box. The facts submitted leave no doubt in our minds that all reasonable precautions were taken to insure a fair and secret ballot.

We are accordingly of the opinion that the election was not void on the grounds above discussed.

### Question 6:

*Did the preparation and distribution of publicity concerning the tax election and the bond election of October 3, 1953 by the Board of Education of the Mount Pleasant Special School District, as set forth in the amended complaint and answer and in the Stipulation of Facts, other than the posting and publication of notices required by 14 Del.C.1953, § 1904 and § 2120, violate 14 Del.C.1953, § 1904 and § 2120 or Article V, §§ 1 and 3 of the Constitution of the State of Delaware so as to render said elections invalid?*

The facts forming the basis of the plaintiff's argument under this heading are as follows:

During the year 1953 and particularly in September and early October there were held various meetings of Parent-Teacher Associations of certain of the public schools, including the schools of the Mount Pleasant District. At one or more of these meetings there

were discussions of the school building program, including the Mount Pleasant bond referendum, by certain school officials. Publicity was given prior to these meetings by statements in the public press, and by circulars, all of which was entirely appropriate and desirable. In addition, a letter dated October 1, 1953, addressed to "Parents and Patrons" on the letterhead of the Mount Pleasant School District, was prepared and sent out by the Superintendent of Schools. This letter is almost wholly factual in its nature. It contains an analysis of the financial needs of the district and of the bearing thereon of the reassessment of real estate in New Castle County. It does contain one or two statements indicating that the proposed building program should in the judgment of the Superintendent of Schools, be supported by the district. In addition a memorandum or circular urging the approval of the bond issue was prepared and circulated, and also a circular containing sketches of children and showing the need for immediate action to provide more class rooms, equipment, etc., couched in such language as to appeal to the natural desire of parents for good education for their children.

A Board of Education charged with the duty of managing the public schools in its district, maintaining them in good condition, and providing for necessary improvements and expansion of the school system, is not prevented from using reasonable publicity to bring the issues before the voters. *Chambers v. Board of Directors,* 172 *Iowa* 340, 154 *N.W.* 581. It does seem to us that some of the publicity urging support of the bond issue, such as the appeals "to get out the vote", and the statement that the voters' approval of the program is "a *must*" if they are to continue to have a good school system, went somewhat beyond the factual presentation which would have been more decorous in an official statement of the case. The expenditure of public funds in support of one side of the matter should be kept within reasonable limits. The temptation to any public official to over-emphasize the importance and the urgency of a project which he sincerely believes is necessary is understandable; but over-statement and emotional appeals in circulars and other similar matter prepared and distributed at public expense are to be avoided. See the discussion of this matter in *Citizens to Protect Public Funds v. Board of Education,* 13 *N.J.* 172, 98 *A.2d* 673.

But we do not think that any serious consequence is to be attached to the matter. There is no showing whatever that the voters were improperly influenced in any way. At the same time that the Board was circularizing the voters an organization of taxpayers opposed to the referendum was likewise conducting a campaign and was also circularizing the voters. It is a fair inference that upon the whole the issue was fairly presented and debated.

We are of opinion that the election may not be set aside on this ground.

*Question 7:*

*Is 14 Delaware Code, 1953, insofar as it permits persons who are not real property holders to vote at school elections, unconstitutional?*

The contention under this heading appears to be the direct contrary of that advanced under Question 3(b). It is here argued that the right of suffrage at school bond elections should be confined to property owners. No constitutional provision in support of this contention is cited and we know of none that could be. The argument comes to this: that it is "unfair" to permit non-owners of property to tax others for their benefit. It is a curious—not to say startling—argument to advance in modern times.

The answer is simple. The right of suffrage is a privilege which may be granted or withheld by the General Assembly under such conditions as it may see fit to impose, subject only to constitutional provisions. *Frieszleben v. Shallcross,* 9 *Houst.* 1, 19 *A.* 576, 8 *L.R.A.* 337; *DuPont v. Mills, supra.* As we have already said, the constitution does not deal with school or municipal elections and the Legislature is free to provide for a suffrage limited to property owners or extended to all qualified voters, as it may see fit. From earliest times it has exercised this right. In the *Code of* 1852, *Sec.* 718, it is provided that "every person residing within the district and having a right to vote for representatives in the General Assembly shall be a school voter of said district."

We hold that the provisions of the school law providing the qualifications of voters are constitutional.

*Question 8:*

"*Has the Board of Education of Mount Pleasant Special School District denied real property holders equal protection of the law by not enacting a poll tax as authorized by 14 Del.C., § 1912 and § 2214?*" [2]

■ Although couched in language appropriate to a constitutional question, the point reduces to one of statutory construction, viz., whether the school laws require a local Board in raising funds to impose a poll tax in addition to a property tax.

14 *Del.C.* § 1912 reads as follows:

"The School Board of the District in which the additional tax is to be levied shall cause to be made from the assessment records of the county in which the district is located, an assessment list containing the names of all the taxables of the district and showing the property assessed against such taxables and the assessment of such property. There may also be added a poll tax on all persons 21 years of age and upwards residing in the district of such amount as shall be determined by the Board."

The deliberate antithesis in the use of the auxiliaries "shall" and "may" in the two sentences of this section is apparent. The command to prepare an assessment list is mandatory; the levying of a poll tax is permissive.

Notwithstanding this plain language, plaintiff argues that the provisions of 14 *Del.C.* § 2114 make it mandatory for a district to provide a poll tax. That section reads as follows:

"The authority to issue bonds shall be construed to be authority to provide funds for the payment of the interest and annual payments on such bonds, which without further authority shall be provided for by an additional tax levy on the property subject to taxation for county purposes in the District issuing

2. The reference to § 2214 is in error. The question refers to § 2114.

such bonds and by a poll tax on all persons 21 years of age and upward, residing in the district, of such amount as shall be determined by the School Board of the District."

Plaintiff reads this section as though it were a command to levy a poll tax, notwithstanding the provisions of § 1912. Plaintiff misconceives the purpose of the section. It is designed to make clear the general authority to tax, as the introductory language clearly shows. The section *directing* the Board of Education to levy taxes is § 2119 which provides in part as follows:

"The Board of Education of any Special School District or the Board of School Trustees of any School District which has issued bonds under the authority of any former school law of this State shall levy and collect taxes to provide funds for the payment of interest on the bonds and for the retirement of the bonds as they shall fall due."

This section requires the board to levy taxes to finance any bonds it may issue; the species of tax is referable to § 1912.

Reading the three sections together it is clear (1) that the board must levy taxes to provide for payment of bonds; (2) that the board must assess and collect a real estate tax; and (3) that it *may* also assess and collect a poll tax. The decision whether the poll tax shall be levied and collected is one committed to the judgment of the board.

We are of opinion that the decision of the board not to assess or collect the poll tax is not a denial of the equal protection of laws to holders of real estate within the district.

III. Questions touching the validity of the assessment of real estate for county and school taxation by the board of assessment of New Castle County.

*Questions 9(a), 9(b), and 9(c):*

9. (a) *Was the real property in the Mount Pleasant Special School District reassessed by the New Castle County Board of Assessment at its true value in money within the meaning of Section 8307(a), Chapter 83, Title 9, Delaware Code Annotated?*

(b) *If the real property in the Mount Pleasant Special School District was not reassessed at its true value in money within the meaning of Section 8307(a), Chapter 83, Title 9, Delaware Code Annotated, was the reassessment valid?*

(c) *Did the Board of Assessment of New Castle County, in making the reassessment for 1954, unlawfully delegate in any respect its statutory duty to make the reassessment and thereby make such reassessment illegal and invalid for all purposes?*

Plaintiff's last objection is to the assessment upon which her taxes are to be based. It is a sweeping one. She asserts that the whole reassessment of real property in New Castle County made during the years 1951-1953 by the New Castle County Board of Assessment is unconstitutional and otherwise illegal.

Before noticing the particular reasons advanced by plaintiff in support of this contention, we think it desirable to emphasize the general principle applicable to a taxpayer's class suit to enjoin an entire assessment of all real estate within the jurisdiction of a board of assessment. Such a suit is not one in which the taxpayer seeks to remedy a particular inequality applicable to his own assessment. To determine such a complaint the law provides for a hearing and determination by the Board of Assessment. This proceeding is in the nature of a process of appeal or review. 9 *Del.C.* § 8319. The case of *Murphy v. Mayor, etc., of City of Wilmington,* 6 *Houst.* 108, 138, indicates that this process of review may be supplemented by *certiorari* from the Superior Court.

What the taxpayer is seeking here is to set aside the entire assessment on the ground that the board has completely disregarded the applicable constitutional and statutory provisions in the performance of its duty. In such a case the burden resting upon the taxpayer is a very heavy one. He cannot sustain it by showing that his own assessment is unreasonably high. So far as concerns such a complaint, an adequate remedy at law is provided.

In *Narehood v. Pearson,* 374 *Pa.* 299, 96 *A.2d* 895, 898, the Supreme Court of Pennsylvania said:

"Where there is an adequate remedy at law in this class of case, this Court has repeatedly said that *Equity should intervene only where there is either want of a power to make the assessment or to levy a tax, or the tax is levied without authority of law, or where there is an utter disregard of imperative constitutional requirements.*"

Thus in the instant case the taxpayer says that the assessment of her property represents an increase of 110 per cent over the prior valuation; whereas the increase in assessment of a neighboring apartment house is about 35 per cent. If injustice has been done, she had a remedy by way of an appeal to the Board of Assessment.

We turn now to the argument of the plaintiff in support of her contention that the entire assessment is void. We have before said that the board employed the J. M. Cleminshaw Co., an appraisal firm, to make a general revaluation of properties in New Castle County. Since what they did is assailed as illegal, we must consider the method used in making the revaluations. It was elaborate and detailed, and is too long to quote in full. It may be summarized as follows:

1. An elaborate construction cost analysis was made.

2. Each house was measured and the type of construction recorded.

3. Recent data on sales were sought and presumably obtained.

4. A final field inspection and review was made for the purpose, among other things, of determining functional depreciation resulting from good houses in poor locations, houses of obsolete design, etc.

5. In the case of commercial and special purpose buildings, earnings were examined to establish a fair basis for rental capitalization.

6. Special methods were used to value industrial plants, fixed machinery and equipment, and public utility buildings.

7. Land value tables were prepared and owners, realtors, banks, and others asked to supply information relative to sales.

From the data thus assembled the Cleminshaw Co. submitted to the Board of Assessment its valuations. The Board of Assessment considered these valuations and then applied to all of them a factor of 70 per cent. The resulting figures represent the board's final valuations for assessment purposes.

The foregoing describes the general method of the reassessment of properties in rural New Castle County.

In the City of Wilmington the Cleminshaw Co. inspected and revalued a thousand sample properties by the same procedure. The record fails to show just how the board made use of these valuations.

With respect to new construction the Board of Assessment itself made the valuations. These valuations were made on the same basis as in prior years, and in a general way followed the method of construction cost analysis above described. As to such properties, however, the board appears to have found that its procedure for assessment needed correction in order to bring the valuations made by it in line with the Cleminshaw valuations. It accordingly increased its own valuations thus arrived at by 40 per cent.

Plaintiff's first objection is that the method of valuation adopted violates the statutory requirement that real property must be assessed "at its true value in money". 9 *Del.C.* § 8307 (*a*). Plaintiff insists that under our law, as under many assessment laws, the test of "true value in money" is market value. This argument is supported by the citation of many authorities from other states. We find it unnecessary to discuss them. Our statute, unlike many other statutes, does not prescribe a single standard of value. In construing this statute our courts have followed the general principle that all elements entering into the value of property are pertinent and relevant and to be considered by the assessors in valuing it. *Council of Newark v. Claringbold,* 5 *Boyce,* 133, 90 *A.* 1130, affirmed 5 *Boyce* 507, 94 *A.* 1102, in an opinion approving and adopting the opinion of the court below.

The method adopted by the Cleminshaw Co. and the Board of Assessment was therefore entirely proper. Reproduction cost less

depreciation was the first step; but other pertinent factors were considered and given weight. Even in those states which prescribe market value as the sole standard, it is recognized that cost less depreciation is a usual and standard method of approaching market value and is an important element in fixing that value. See, for example, *Central Railroad Co. of N.J. v. State Board*, 49 *N.J.L.* 1, 7 *A.* 306.

And in the light of the obvious difficulties attending a general reassessment of real estate within a county, use of reproduction cost less depreciation, corrected so far as possible by other pertinent factors, seems entirely sound. See the discussion in 1 *Bonbright, Valuation of Property, pp.* 459-460.

In *Alexander v. Mayor & Board, (Miss.,* 1953) 68 *So.2d* 434, 439, a contract with an appraisal firm providing for a method of appraisal similar to that in this case was assailed and upheld.

Commenting on the Constitution of Mississippi requiring reassessment of property "at its true value," *Const.* 1890, § 112, the Supreme Court of that State said:

"This provision is amply complied with in the contract, the obvious purpose of which is to obtain a realistic and up-to-date valuation of properties in the city in the light of established economic facts. The contract expressly provides that replacement, physical and sound values of the properties will be shown, and that building costs and other relevant factors will be used in such computations."

 It is also to be observed that the valuations of the Cleminshaw Co. were the valuations of expert appraisers. Certainly a presumption of competency and fairness attaches to their work.

We find nothing of substance in this objection.

The second point urged against the Cleminshaw valuation is that the board by employing them and approving their findings has unlawfully delegated its duty to make the assessment itself. Plaintiff cites and relies upon the general principle that a Board of Assessment, in valuing and assessing real estate for the purposes of taxation, is

performing discretionary or quasi-judicial duties and the performance of such duties as may not be delegated to others. 51 *Am.Jur.* *"Taxation", Sec.* 664; *annotation at* 107 *A.L.R.* 1482.

Plaintiff's argument is almost reducible to a contention that the Board of Assessment of New Castle County, confronted with the necessity of a general reassessment of real estate within the county, was prevented from employing expert help by the application of the principle of non-delegation of power. When the magnitude of the task before the board is considered, it is apparent that if such an objection be sound, a general reassessment of properties, admittedly desirable and necessary, could never be accomplished within any reasonable period of time. As a practical matter, it would be a physical impossibility. The court takes judicial notice of the substantial increase in the population of New Castle County within recent times and of the greatly increased value of real estate.

In these circumstances we think that the method adopted by the board under authority of the Levy Court of New Castle County was entirely legal and proper. Indeed, it may be said to have been the only feasible method that could have been adopted.

The employment of expert appraisers in modern times to assist a Board of Assessment in obtaining a reasonable and uniform assessment and valuation of real estate for taxation is nothing new. It is particularly appropriate to the valuation of properties in urban and industrial centers. The use of expert appraisers does not necessarily involve the delegation of the assessors' authority. It is entirely legal to obtain such assistance, provided that the board makes the final decision. That the board in this case made the final decision is clear. Although it might have approved the Cleminshaw valuations as submitted, it actually reduced them by 30 per cent. The final assessment, therefore, was the board's own. Hence there was no delegation of power.

There are numerous cases in accord with the general views above expressed. In the recent case of *Conroy v. City of Battle Creek,* 314 *Mich.* 210, 22 *N.W.*2d 275, 278, the employment of expert appraisers was assailed as an unlawful delegation of municipal powers to a

stranger. Rejecting this argument, the Supreme Court of Michigan said:

> "The valuation of real estate and improvements has always been difficult and presents many problems, and even with the applied science for valuation and appraisal, the true value cannot be obtained with mathematical exactitude, but by the application of these modern rules as developed, a much fairer degree of accuracy is arrived at than existed theretofore. There is no vice in seeking expert information from others than residents of the city itself. It seems almost impossible for one assessor in the city of the size of Battle Creek to obtain all this correct information and to know without assistance the correct factors and rules in order to arrive at a fair valuation. It is an implied power of the commission to obtain such expert knowledge from what in good faith it evidently must have believed a reliable source. It must be assumed that the company will make a very careful study of local conditions including costs by gathering all information as to past sales and all other local data. There even might be some advantage in obtaining such information through persons free from all local influences whatsoever. We again repeat that the contract provided that the city assessor was to have the last word and final decision, although assisted by experts. There was no delegation of power whatsoever, and it was not ultra vires for the city to obtain this expert information."

To the same effect are *Barrett v. Munger,* 201 *Misc.* 985, 115 *N.Y.S.2d* 708 (involving a Cleminshaw appraisal), and *Daniels v. Board of Review,* 243 *Iowa* 405, 52 *N.W.2d* 1.

Plaintiff attempts to turn to her advantage the use of the 70 per cent factor. She contends, if we understand the argument, that this reduction was arbitrary and improper. Presumably the board thought the Cleminshaw figures somewhat high. If so, it was its duty to exercise its best judgment to arrive at more reasonable figures. We must assume that they did exercise such judgment. And in any view of the matter, plaintiff can make nothing of the reduction. Since the figure applied to all taxpayers alike, its use wrought no injustice and is quite immaterial to the present point. *Greene v.*

*Louisville & Interurban R. R. Co.,* 244 *U.S.* 499, 37 *S.Ct.* 673, 680, 61 *L.Ed.* 1280. As was said in *Hammermill Paper Co. v. City of Erie,* 372 *Pa.* 85, 92 *A.2d* 422, 425: "This * * * is a method often employed".

We are of the opinion that the Board in employing the services of an expert appraisal firm did not unlawfully delegate its duties, and that it committed no legal error in using the figure of 70 per cent of the Cleminshaw valuations.

The third point made by plaintiff in assailing the assessment is that the methods of the board in valuing Wilmington properties and in valuing new constructions was a different method from that employed by Cleminshaw; that the use of different methods to value property of like character is destructive to uniformity and in violation of the constitutional mandate, *Art. VIII,* § 1, that "all taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax"; and that the entire assessment is therefore illegal.

This argument ignores the fact that the 40 per cent increase in the valuation of the new construction by the Board of Assessment was specifically designed to insure uniformity. The following fact appears in the record:

> "That the Board, commencing July 6, 1953, and to be completed on or about April 1, 1954, reassessed each piece of real property in New Castle County revalued by Cleminshaw at 70% of the valuation as determined by Cleminshaw and reassessed each such piece of real property previously valued and assessed by it by increasing its assessment 40%, the percentage of increase determined by the Board to be required to bring its prior assessment in line with the reassessments based on the Cleminshaw valuations."

It thus appears that the board, realizing that its own revaluations had not achieved uniformity with Cleminshaw's, determined that a 40 per cent increase in its valuations was required to secure uniformity. Having made such a determination, it made the necessary increase.

The use of a general percentage of increase in similar situations has been approved. A like factual situation was presented to the court in the case of *Citizens Committee, etc. v. Warner,* 127 *Colo.* 121, 254 *P.2d* 1005, 1009. This case involved a general reappraisement of properties in Pueblo County, Colorado. Valuations were determined as follows:

> " '(b) On lands within the business districts of Pueblo, exclusive of improvements, the reappraisal value was used where such lands had been reappraised; where not reappraised because of time limitations, a uniform increase of 25% over the 1951 assessed valuation was added thereto in order that the 1952 assessed valuation thereon would be equalized with those that had been reappraised;

> " '(c) That on all other real property within the said Pueblo County the reappraised values were used where made; in the Aberdeen area of Pueblo, the assessed valuations were increased such an amount as would equalize their value with that of similar property within the said City of Pueblo; on lands other than those above-mentioned, the 1951 assessed valuations were used by me in making up the 1952 assessment role for Pueblo County'."

The Supreme Court of Colorado upheld the assessment. It said:

> "From the foregoing it will be noted that all personal property was valued in accordance with the March 1, 1952, appraisal; that an unspecified portion of the lands in the business district had been reappraised, from which it was determined that the values thereby fixed were such as to require, as a mathematical calculation, a twenty-five per cent increase over the 1951 valuation on lands not reappraised, in order to equalize same with those that had; that on all other real estate, reappraised values were used where made, and in the Aberdeen area, the valuations were increased in such 'amount as would equalize their value with that of similar property.' It is clear that, in the absence of actually completed reappraisal itself, every effort was made to

attain equality and uniformity from such calculations, based on the experience of reappraisal, the final results doubtless closely approximated what would have been shown by the completed reappraisal."

As to the Wilmington properties, the plaintiff fails to show just what the board did. It was obviously the duty of the plaintiff to adduce facts in support of her claim of discriminatory methods of valuation. She has not done so, and her claim as to Wilmington must fail.

In any general reassessment of real estate for the purpose of taxation uniformity is the important and vital end to be obtained. The requirement of uniformity in the rate of taxation necessarily requires a reasonable measure of uniformity in the method of valuation. Deliberate discrimination between the taxpayers in the valuation of similar property is a violation of the constitutional requirement. This principle is well settled and is not to be questioned. 51 *Am. Jur. "Taxation"*, § 172. If the taxpayer can show that he has been discriminated against in such a manner, he has his remedy. The cases cited by the plaintiff are of this kind. See, for example, *Raymond v. Chicago Edison Co., 207 U.S. 20, 28 S.Ct. 7; Utah-Idaho Sugar Co. v. Salt Lake County, 60 Utah 491, 210 P. 106, 27 A.L.R. 874; Cumberland Coal Co. v. Board of Revision, 284 U.S. 23, 52 S.Ct. 48, 76 L.Ed. 146.*

Nothing of that sort appears here. On the contrary, such evidence as is before us indicates that the Board adopted fair and reasonable methods to insure uniformity. This is all that is necessary.

We are of opinion that none of the objections to the assessment is well taken.

A final observation should be added. The Board of Assessment must certify to the Levy Court the total of its assessed valuation not later than May 1 (*9 Del.C.* § 8315) and the Levy Court must prepare its budget, fix the tax rate and levy the tax not later than May 15 (*9 Del.C.* §§ 8001-8003). Consequently, in the labor of briefing, arguing, and deciding this important case, counsel and the court have

been subject to severe pressure of time. This opinion has attempted to deal, as adequately as possible, with the many legal questions presented. Some subsidiary or incidental arguments have not been specifically dealt with, but they have not been overlooked. We are satisfied that the plaintiff's case has no legal merit.

Order answering the certified questions in accordance with the foregoing opinion.